### IN THE

# SUPREME COURT OF TENNESSEE

### FOR THE

## WESTERN DIVISION.

### JACKSON, APRIL TERM, 1916.

STATE *ex rel.* THOMPSON, Atty-Gen., *v.* REICHMAN,
Sheriff.

*(Jackson.* April Term, 1916.)

1. **SHERIFFS AND CONSTABLES.** Powers and duties.
The office of sheriff carries all the common-law powers and
duties except as modified by statute. (*Post, pp.* 661, 662.)
Acts cited and construed: Acts 1915, ch. 11; Acts 1909, ch. 1;
Acts 1913, ch. 2.

Case cited and approved: State v. Crump, 134 Tenn., 121.

2. **SHERIFFS AND CONSTABLES.** Powers and duties. "Notice."
Under Shannon's Code, section 6899, a sheriff who has "notice" of
an offense and does not do his duty to prevent it is guilty of a
misdemeanor, and any knowledge from any source is notice
within the statute. (*Post, pp.* 662-666.)

Code cited and construed: Secs. 452, 6892-6895, 6898, 6899, 6900,
6978, 6997 (S).

*Note.*—See following opinion on petition to rehear.

135 Tenn.] (653)

3. **SHERIFFS AND CONSTABLES. Powers and duties. Notice.**
Since cities have police officials, the sheriff may assume that they will perform their duties, but if he has knowledge of neglect on their part, or reason to think there is neglect, he must inform himself and prevent and suppress offenses in cities as well as rural districts. (*Post, pp.* 666, 667.)

4. **ARREST. Arrest without warrant. "Breach of the peace." Unlawful sale of liquors.**
"Breach of the peace" being a generic term including all violations of public peace or order, includes unlawful sale, actual or threatened, of intoxicating liquors, and the sheriff may arrest without warrant therefor. (*Post, pp.* 667-669.)

Acts cited and construed: Acts 1877, ch. 23.

Cases cited and approved: Webster v. State, 110 Tenn., 507, State v. Frost, 103 Tenn., 694.

Cases cited and distinguished: Galvin v. State, 46 Tenn., 294; Smith v. Knoxville, 40 Tenn., 247.

5. **ARREST. Arrest without warrant. Threatened unlawful sale of intoxicating liquors.**

While mere possession of intoxicating liquors in any quantity is not unlawful, it is a breach of the peace for one having liquors to prepare for sale thereof, that being a threat to violate the law against sales. (*Post, pp.* 669-673.)

Cases cited and distinguished: Hayes v. Mitchell, 69 Ala., 454; Johnson v. Mayor, 46 Ga., 80; Boaz v. Tate, 43 Ind., 60.

6. **ARREST. Arrest without warrant. Threatened sale of liquors.**
The right of the sheriff to arrest without warrant for theatened unlawful sale òf intoxicating liquors and to close the place of business is not unlawful as an arbitrary invasion of property rights, which are not more sacred that the person, which may be seized to prevent breach of peace. (*Post, pp.* 673, 674.)

Case cited and approved: Yerkes v. Smith, 157 Mich., 559.

7. **SHERIFFS AND CONSTABLES. Duties. Compensation.**
The requirement that the sheriff, to prevent breaches of the peace, arrest one who threatens unlawful sale of intoxicating

State ex rel. v. Reichman.

liquors and if necessary close his place of business, is not subject to the objection of requiring services without compensation. (*Post, pp.* 674, 675.)

8. **ARREST. Arrest without warrant. Threatened unlawful sale of intoxicating liquors.**

For a misdemeanor committed without his presence, a sheriff cannot arrest without warrant; but, if breach of peace is threatened in his presence, he needs no warrant to arrest to prevent the breach under Shannon's Code, section 6892. (*Post, pp.* 675, 676.)

Code cited and construed: Sec. 6892 (S.)

9. **SHERIFFS AND CONSTABLES. Duties of sheriff. Investigations.**

The duty of the sheriff, having notice of commission of an offense being to prevent or suppress it, involves the duty to at least make some investigation, and it is not necessary in case of unlawful sales of intoxicating liquors, for the sheriff to actually see sales before swearing out warrants. (*Post, pp.* 676, 677.)

Case cited and approved: State v. Good, 77 Tenn., 240.

10. **SHERIFFS AND CONSTABLES. Duties of sheriff. Investigations.**

Although the sheriff is not bound to maintain a detective force, and no statute in terms make it his duty to swear out warrants or give information to the grand jury, yet being commanded to prevent and suppress crimes and breaches of the peace, he must use all the means provided by law to accomplish such end. (*Post, p.* 677.)

11 **SHERIFFS AND CONSTABLES. Powers and duties. Breach, Evidence.**

Evidence *held* to show that a sheriff failed to perform his duties to prevent and suppress breaches of the peace by unlawful sale and threatened unlawful sale of intoxicating liquors. (*Post, pp.* 678-680.)

12. **SHERIFFS AND CONSTABLES.** Breach of duties. Defenses.
It is no defense for the sheriff's failure to prevent breaches of the peace by unlawful sales of intoxicating liquors, that the State was proceeding against offenders under the Nuisance Act (Laws 1913 [2d Ex. Sess.] chapter 2), or that the criminal court administration was lax and nothing would have been accomplished in case of arrest. (*Post, pp.* 680-684.)

Cases cited and approved: Commonwealth v. Wright, 158 Mass., 149; Pinkerton v. Verberg, 78 Mich., 573; Jamison v. Gaernett, 10 Bush. (Ky.), 221; Robinson v. Miner, 68 Mich., 549. .

---

## FROM SHELBY.

---

Appeal from the Chancery Court of Shelby County. —F. H. HEISKELL, Chancellor.

G. T. FITZHUGH and F. M. THOMPSON, Attorney-General, for appellant.

CHAS. M. BRYAN and T. K. RIDDICK, for appellee.

MR. W. L. FRIERSON, Special Justice, delivered the opinion of the Court.

This is a petition filed by the attorney-general of the State in the chancery court of Shelby county to remove the defendant from the office of sheriff of that county under the provisions of chapter 11, Acts 1915, entitled "An act to provide for the removal of unfaithful public officers, and providing a procedure therefor."

The petition contained many charges. Some of them, however, were considered by the chancellor insufficient,

---

*Note.*—See following opinion on petition to rehear.

even if true, to warrant a removal and were stricken out. There was then a very full hearing on the remaining charges with the result that the chancellor held that no misconduct or neglect of duty sufficient to justify a removal was shown and dismissed the petition.

The charge of the petition which has been the subject of the chief controversy, relates to the laws against the sale of intoxicating liquors. It is stated in great detail. But the substance of it is that, during his term as sheriff, defendant has not only failed and neglected to enforce these laws, but, through an agreement or understanding with the officials of the city of Memphis, has permitted saloons to be run in violation of law.

Both parties introduced a great mass of evidence touching this charge. From a consideration of this evidence, we think the following facts are established with but little conflict between the witnesses. Since the passage of the Act of 1909 extending the four-mile law (Laws 1909, chapter 1), which made the sale of intoxicating liquors in Memphis unlawful, the handling of the liquor question in that city has assumed a new phase with each new act passed by the legislature to secure the enforcement of the law. From 1909 to March 1, 1914, the law seems to have been entirely ignored. The saloons seem to have been recognized, and, in a measure regulated by the city officials. During this period, for a part of the years 1910 and 1911, the defendant was police commissioner of the city of Memphis. He knew the conditions, but made no ef-

135 Tenn. 42

fort to enforce the liquor laws. On the contrary, as he admits, he recognized the existence of saloons and assumed to regulate them by requiring that they close each night at midnight, and remain closed all day Sunday. This condition continued and the saloons seem not to have been disturbed from any source until March 1, 1914, when what is known as the "Nuisance Act" went into effect (Laws 1913 [2d Ex. Sess.] chapter 2). Then began a period during which the only effort to enforce the law was through injunction bills filed by the district attorney-general or special counsel employed by the governor. The city authorities still did nothing. But several hundred injunction bills were filed and a great many places closed and a large number of dealers were sent to the work-house for violating the injunctions. Just what the conditions were during this period is the subject of some controversy, but we think it fairly appears that intoxicating liquors continued to be sold in many places in the city in varying degrees of openness. There was undoubtedly some effort at secrecy and concealment to guard against surprise by the special counsel in charge of the injunction suits and the officer working under him. But no danger seems to have been apprehended from any other source. Some places maintained bars; others did not. In many places liquors were served in the rear of barber shops, restaurants, and small grocery stores. In some, lunch counters were used as blinds, and, in others, sales were made behind interstate shipping house signs. The main difference, perhaps, was

that stocks of liquors were not kept conspicuously displayed, but were kept more or less concealed, or where they could be quickly removed.

These were the conditions in the city when in August, 1914, defendant was elected sheriff, and on September 1, 1914, when he assumed the duties of that office. They remained unchanged until about February 1, 1915. During that time he did nothing toward enforcing the liquor laws in the city of Memphis except to serve the process from the chancery courts in some three hundred injunction cases. There were, however, a number of roadhouses and other places outside of the city where liquors were being sold. These he seems to have endeavored to break up. He was advised by his counsel that he had no right to make searches or to arrest, without a warrant, for a misdemeanor, unless committed in his presence. But notwithstanding this, he had his deputies make a number of raids, arrest a good many people, and destroy a considerable quantity of liquor. He also, through his deputies, secured the indictment of a considerable number of persons for selling liquors outside of the city.

But, on January 29, 1915, the act for the removal of unfaithful officers, known as the "Ouster Law," went into effect. Immediately the defendant and the city officials held a conference. The mayor made a public announcement that the liquor laws would be enforced in Memphis. Defendant announced that, co-operating with the city officials, he would enforce the law in the county. And, for a short time, there seems to have

been a very fair enforcement of the liquor laws in Memphis. But, soon after the passage of the ouster bill, the policy of enforcing the law through injunction suits was abandoned and nothing further was done in that line except to wind up the suits already commenced.

Then, about May 1, 1915, the city officials adopted a new policy. Through the police, lists were made of all the places in the city in which it was known that liquor was being sold. Each dealer was arrested, but if he would turn over to the arresting officer "a forfeit" of $50, he was left undisturbed in his place. If he did not appear at the city court, his $50 was forfeited to the city, and this ended the matter. If he appeared he was fined $50. In neither event was he bound over to the grand jury. Defendant admits that he knew of this practice. Some effort is made to deny that it was understood that the periodical payment of this $50 would enable the dealer to continue his unlawful business without molestation. But it had this effect and we cannot doubt, from the record, that it was so intended and understood. Under this plan Memphis again had fairly open saloons. In places there was still some secrecy. Some places were being run in violation of injunctions, and precautions had to be taken. Others were selling on the sly and trying to avoid paying an occasional "forfeit" of $50 to the city. But there were a great many open saloons.

These were the conditions prevailing during defendant's term of office and at the time the petition in this

cause was filed.  For misconduct and neglect of duty
in permitting them to exist, the mayor and other city
officials have been removed.  *State* v. *Crump,* 134 Tenn.
121, 183 S. W., 505.  The question now is whether they
also furnish ground for removing defendant from the
office of sheriff.  If he was responsible for them or if
they were due to his neglect of any duty which the law
imposed on him, he is unworthy and must be removed.
But if he has neglected no duty, if the law did not re-
quire him to do the things it is insisted he did not do,
and we should remove him because of the conditions we
have described, we would do judicial violence to the
law—the worst kind of lawlessness.

For the State, is is insisted that it was his duty to
suppress these lawless saloons, arrest the offenders and
report them to the grand jury.  For the defendant, it
is insisted that he was under no duty to do detective
service to discover violations of the law; that he had
no authority to arrest for misdemeanors, without a
warrant, unless the offense was committed in his pres-
ence; that it was not only not his duty, but would be
unlawful for him to swear out a warrant on informa-
tion; that no sales of liquor were made in his presence;
and that, therefore, he neglected no duty which the
law imposed on him when he failed to put an end to
the conditions of which complaint is made.

To determine this issue, it is necessary to under-
stand just what the duties of a sheriff are.  The office
of sheriff is a most ancient one.  It carries with it, in
America, all of its common-law duties and powers ex·

cept as modified by statute. We have several stat-
utes which bear on the question and which, taken to-
gether, set out the duties of the sheriff very much as
they existed at common law.

Aside from the ordinary duties to execute and re-
turn process, to attend upon the courts, and to take
charge of the jail, the following statutes, as set out in
Shannon's Code, are applicable:

Sec. 452. "The sheriff and his deputies are conser-
vators of the peace, and, to keep the  peace,  prevent
crime, arrest any person lawfully, or to execute pro-
cess of law, may call any person or summon the body
of the county to their aid."

Sec. 6892. "Public offenses may be prevented by
the intervention of the officers of justice (1) by requir-
ing security to keep the peace; and (2) by suppressing
riots, unlawful assemblies, and breaches of the peace."

Sec. 6893. "Whenever the officers of justice are au-
thorized to act in the prevention of public offenses,
other persons who, by their command, act in their aid,
are justified in so doing.

Sec. 6894. "The sheriff is the principal conservator
of the peace in his county, and it is his duty to suppress
all affrays, riots, routs, unlawful assemblies,  insur-
rections, or other breaches of the peace, to do which,
he may summon to his aid as many of the male inhab-
itants of the county as he thinks proper."

Sec. 6895. "The judicial and ministerial officers or
justice in the State, and the mayor,  aldermen,  mar-
shals, and police of cities and towns, are also conser-

vators of the peace, and required to aid in the prevention and suppression of public offenses, and for this purpose may act with all the power of the sheriff.''

Sec. 6898. "If any person commanded to aid, under the provisions of this chapter, any magistrate or officer, without good cause, refuses or neglects to obey such command, he is guilty of a misdemeanor.''

Sec. 6899. "If a magistrate or officer, having notice of any unlawful act provided against in this chapter, neglects or refuses to do his duty in the prevention of the public offense, he is guilty of a misdemeanor.''

When an offense has been committed, a warrant for the arrest of the offender may be issued by a justice of the peace, upon information, after he has examined the informant on oath and is satisfied that the offense has been committed.   Shannon's Code, section 6978.

The cases in which, to prevent a breach of the peace, the sheriff may, without a warrant, arrest a person for the purpose of requiring him to give security to keep the peace are set out in section 6900 of Shannon's Code as follows:

"It is the duty of all peace officers who know or have reason to suspect any person of being armed with the intention of committing a riot or affray, or of assaulting, wounding or killing another person, or of otherwise breaking the peace, to arrest such person forthwith, and take him before some justice of the peace.''

The succeeding section provides how the justice of the peace shall require bond of the offender and, in default thereof, commit him to jail.

With respect to the arrest, without a warrant, of persons accused of felonies, an officer is given a rather wide latitude, but beyond this and the section just quoted, the only provision for such arrests is:

"An officer may without a warrant, arrest a person: (1) For a public offense committed or a breach of the peace threatened in his presence." Shannon's Code, section 6997.

To summarize, it is the duty of a sheriff to keep the peace and prevent or suppress crimes and public offenses. In order to do this, he is authorized to arrest, without a warrant, persons known to be or suspected of being armed for the purpose of committing a breach of the peace, and such persons may be required to give security to keep the peace. All other breaches of the peace he is simply commanded to suppress. And, to this end, he is authorized, for such a breach of the peace threatened in his presence, to make an arrest without a warrant. He may likewise arrest for any misdemeanor committed in his presence. In the case of all other misdemeanors, he must have a warrant.

Now what kind of an officer does this make of a sheriff? We cannot agree that he is a mere process server, or that he may, if he would discharge the duties of his office, be passive until some one swears out a warrant for him to serve. Nor can he, if he knows in any way that a public offense has been committed or is about to be committed, remain inactive. His duties are not merely to apprehend those who have committed offenses but to prevent such offenses. The sections of the

Code quoted make this plain.   He is ''to keep the
peace'' and prevent crime.''   He is to prevent ''public
offenses'' and suppress breaches of the peace.   He is
the commander in chief of the law forces of the county.
All judicial and ministerial officers of justice and all
city officials are required to aid him, and the male
population of his county is subject to his command ''in
the prevention and suppression,'' not only of violent
breaches of the peace, but of all public offenses.   It is
idle to say that all this does not imply initiative on the
part of the sheriff in the enforcement of the law against
public offenses.   The duties imposed cannot be per-
formed without some degree of activity and diligence
to inform himself of conditions in his county.   Cer-
tainly they preclude the idea that he may, without der-
eliction, shut his eyes to what is common knowledge
in the community, or purposedly avoid   information,
easily acquired, which will make it his duty to act.

We do not mean that it is his duty to patrol the coun-
ty as the streets of the city are patrolled by the police, or
to maintain a detective force to ferret out crimes.   All
we now decide is that it is the duty of the sheriff and
his deputies to keep their eyes open for evidence of
public offenses, and that it is a distinct neglect of duty
for them to ignore common knowledge of law   viola-
tion or to intentionally avoid being where they have
reason to believe that such offenses are being commit-
ted.   And to make imperative action in the discharge of
his duty to prevent and suppress, it is not necessary
that the sheriff shall see, with his own eyes, an offense

committed or about to be committed. By section 6899, Shannon's Code, it is provided that if he has notice of such offense and does not do his duty in preventing it, he is guilty of a misdemeanor. We hold that knowledge coming to him from any source is "notice" within the meaning of this statute.

Again it is clear that the duties and powers of a sheriff within the limits of an incorporated city are precisely the same that they are in the remainder of the county. The law draws no distinction. The city officials are conservators of the peace. But they do not supplant him. On the contrary, by the express terms of the statute, they are to aid him. He is the chief and they are his assistants. True, there is not ordinarily the same need for vigilance on his part in the city as in the country. One of the chief reasons for the incorporation of towns and cities is to provide in the more densely populated sections, better police protection, than, in the nature of things, the sheriff's office can afford. When, therefore a city has patrolling its streets a police force employed expressly, to detect crime and apprehend offenders, the sheriff, in the absence of information to the contrary, is justified in assuming that the city officials will do their duty, and hence will not be guilty of any serious neglect of duty if he gives little attention to police matters in such city. But if he has reason to believe that the police force is neglecting its duty, or is in league with offenders, it is his duty to inform himself. And, if he knows that the city officials are deliberately ignoring

or permitting a certain class of offenses, his duty to
prevent and suppress such offenses is the same it would
be if there was no municipality and no police force.

⌈The unlawful sale of liquor is undoubtedly a
misdemeanor and public offense in Tennessee.  Is it
not also a breach of the peace?  ''The term 'breach of
the peace' is generic and includes all violations of pub-
lice peace or order, or acts tending to the disturbance
thereof.'' 5 Cyc. p. 1024, citing many authorities.  And
this court has said:

''A breach of the peace is 'a violation of public order,
the offense of disturbing the public peace.  An act of
public indecorum is also a breach of the peace.' '' *Gal-
vin* v. *State*, 6 Cold., 294.

The sale of intoxicating liquors has always been rec-
ognized as tending to provoke disturbances of good
order and breaches of the peace.  When such sales
were lawful it was found necessary to impose upon
them strict regulations to prevent breaches of the
peace.  Speaking of such a regulation this court long
ago said:

''This is a police regulation, for the good order and
quiet of the city.''  *Smith* v. *Knoxville*, 3 Head. 247.⌋

See, also, *Webster* v. *State*, 110 Tenn., 507, 82 S. W.,
179.

The original four-mile act, which exempted from its
operation incorporated towns, was sustained as a rea-
sonable police regulation for the preservation of peace
and good order.  And the exception of incorporated
towns was justified upon the theory that such towns
''would provide the necessary police force, so as to

keep down disturbances and breaches of the peace that arise out of the sale and use of intoxicating liquors.'' *State* v. *Frost,* 103 Tenn. 694, 54 S. W. 986.

And so when the four-mile law was extended to incorporated towns and cities, the purpose was still to preserve peace and good order. The Legislature of 1877 (Laws 1877, c. 23) considered the sale of liquor without adequate police protection a disturber of peace and good order, and prohibited it. But that Legislature thought that, with such protection as towns and cities could afford, it was possible for liquor selling and peace and good order to coexist. However, after an experience of 32 years, the Legislature of 1909 evidently concluded that the sale of liquor, with or without police protection, was destructive of or, at least, dangerous to peace and good order. Whether we would have reached the same conclusion is immaterial. The Legislature has so declared and we hold that the liquor laws of the state were passed as a means for preserving the peace, and that their violation is a breach of the peace.

We have been cited to no case, and have found none which, in terms, decides that the unlawful sale of liquor is a breach of the peace. But the conclusion we have reached follows irresistibly from the definition of a breach of the peace generally accepted by the courts and from the logic of our cases cited above, and we are entirely satisfied with its soundness. True the unlawful sale of liquors is not a breach of the peace to prevent which the sheriff may arrest a person and re-

quire him to give bond to keep the peace. That, as we have seen, can only be done when one is armed for the purpose of committing a breach of the peace. It belongs rather to that class which the sheriff is commanded to suppress, and to prevent which, when threatened in his presence, it is his duty to arrest without warrant. It is of the same class and to be dealt with in the same way as the breaches of the peace enumerated in the brief of counsel for defendant, as follows:

"The term, 'breach of the peace' is generic, and includes riotous and unlawful assemblies, riots, forcible entry and detainer, the sending of challenges and provoking to fight, going around in public, without lawful occasion, in such manner as to alarm the public, the wanton discharge of firearms in the public streets, engaging in an affray or assault, using profane, indecent, and abusive language by one toward another, on a street and in the presence of others, or being intoxicated and yelling on the public streets in such manner as to disturb the good order and tranquillity of the neighborhood." 8 Ruling Case Law, p. 285.

The unlawful sale of liquor being a breach of the peace, it is not always necessary for an officer to actually see a sale before he is authorized to make an arrest without a warrant. If, in his presence, such a sale is threatened, he is authorized to arrest as for any other threatened breach of the peace. The threat need not be in words. If one man puts himself in a position to assault and, by his acts, manifests a pur-

pose to assault another, a breach of the peace is un-
doubtedly threatened. How does this principle apply
to a threatened unlawful sale of intoxicating liquors?
The condemnation of our statutes is confined to the
selling of such liquors. It is not unlawful for a man
to have liquors, in any quantity, in his home or in his
place of business. The mere presence of liquors, there-
fore, without more, is not a public offense, and will not
under all circumstances, indicate a purpose or threat
to sell them unlawfully. Thus a stock of liquors in a
house from which an interstate shipping business is
being done may have no unlawful significance. [But
when liquors are found in a place of business fitted up
as only saloons are usually equipped, with a bar, bar-
tenders, bottles, glasses, and all the paraphernalia
commonly used in places where drinks are served, there
can be no doubt of the purpose. Men do not maintain
places of that kind except for one purpose. Such a
place, standing fully equipped and ready to serve the
public, is a constant threat to sell liquor unlawfully
and thus breach the peace. ]It cannot be that an offi-
cer, charged with the duty of preventing breaches of
the peace, with this threat before his eyes, and with the
certainty that the threat will be carried into execution
the moment he is out of sight, is powerless to act be-
cause there has not already been a breach of the peace.
We emphasize his duty to prevent offenses. And cer-
tainly no rights of an individual are violated when he
is simply deprived of the privilege of doing that which
is unlawful. The interposition of the law to prevent

a crime is more humane and less harsh that its punishment for one committed.

Our act authorizing an arrest for a threatened breach of the peace was taken from the Alabama Code of 1852. And we quote, with approval, what the Supreme Court of that State has said in sustaining the right of an officer to prevent a threatened breach of the peace as follows:

"Two great and vital principles of government are to be kept steadily in view, in pronouncing on conduct, such as is brought to view in this record; the liberty of a citizen, and the peace and repose of society. Civil liberty is natural liberty, shorn of the excesses which invade and trench on the equal liberty of others. No one can claim the right to violate the law, and precautionary force is justified, to prevent a greater impending evil. Such force, however, is in its nature remedial, and can be carried no further than is reasonably necessary to prevent the threatened wrong. Prevention is less hurtful than redress, and when prudently exercised, is not only justified, but is commended of the law. No man can rightfully complain of any encroachment upon personal liberty, which he himself by his lawlessness or violence has rendered necessary for the safety and protection of others. It is liberty as defined by law, not unbridled license, our free Constitution guarantees to every man—the humblest, equally with the most exalted." *Hayes* v. *Mitchell,* 69 Ala. 454.

We hold therefore, that a person found in control of such a place as we have described is subject to ar-

rest, without warrant, as for a breach of the peace
threatened in the presence of an officer. It may be true
that he has not committed any offense for which he may
be indicted and prosecuted. But neither has the man
who has threatened an assault and battery, or to send
a challenge, but has been arrested before he could put
his threat into execution. In such cases the arrest is
made not for the purpose of inflicting punishment, but
to prevent the necessity for punishment. It is not to be
followed by imprisonment, unless it shall be necessary
to so restrain the offender to prevent the threatened
offense. The limit of the force that may lawfully be
used to prevent a breach of the peace, as held by the
Alabama court, is that it shall "be carried no further
than is reasonably necessary to prevent the threatened
wrong."

In the Alabama case referred to it was held that
the circumstances might be such as to justify the ar-
resting officer in even putting the offender in jail, the
court saying:

"The right to imprison was a question for the jury,
under appropriate instructions. There should certain-
ly be no imprisonment, unless the circumstances ren-
dered such imprisonment necessary. If, by reason of
the unreasonableness of the hour, or the inaccessibility
of the mayor or other magistrate having jurisdiction,
the offender could not be then brought to trial; or, if by
reason of riotous or lawless conduct, the peace-preserv-
ing powers of the marshal were, or seemed to be in
request, to maintain the general peace, or, to protect

others or their property from lawlessness, then it would not be the duty of the marshal to exhaust his entire energies, in personally detaining the prisoner, to the neglect of all other equally pressing duties. In such case, he would be authorized to imprison the offender, until he could be properly brought to trial." *Hayes* v. *Mitchell,* 69 Ala. 452; *Johnson* v. *Mayor,* 46 Ga. 80; *Boaz* v. *Tate,* 43 Ind. 60.

In other words, in obedience to the command to prevent and suppress breaches of the peace, the officer making the arrest is to do whatever, under the circumstances is reasonably necessary to prevent the threatened offense. In the event of an unlawful assembly, he will comand that the persons assembled disperse. If the command is obeyed, his duty is done. If it is not obeyed, he will arrest those who disobey and detain them until the assembly is dispersed. *Yerkes* v. *Smith,* 157 Mich. 559, 122 N. W. 223. If one threatens an assault and is arrested by an officer, in whose presence the threat is made, he will be detained until the danger of the assault appears to have passed, and then released. So if an officer finds a saloon, such as we have described, it is his duty to do whatever is reasonably necessary to prevent the threatened sales of liquors. Manifestly his first step will be to arrest the person in charge for a threatened breach of the peace. Having done this, he should detain such person until the danger of the threatened breach of the peace is removed. How this danger can be effectually removed will depend on the circumstances. If this can be done

135 Tenn. 43

by seizing and removing the liquors, such action is within the power of the officer. Or, if necessary, he may close the place of business and keep it closed until the purpose of conducting it as a saloon is abandoned.

It may be said that this involves an arbitrary invasion of property rights. But the law does not hold one's property more sacred than his person. And it must be conceded that his person may be seized when necessary to prevent a breach of the peace.

It is insisted that this calls on the sheriff to render services for which the law provides no compensation. It may be that he will sometimes do things not covered by the fee bill. But, if so, this is nothing more than is incident to the work of men in every walk of life. He must take his office with its burdens as well as its emoluments. Besides when one is arrested for threatening a breach of the peace by maintaining a saloon, it will rarely be the case that sufficient evidence of past offenses will not be found to justify swearing out a warrant upon which the offender can be prosecuted and convicted.

Of course what we have said here does not apply to all places in which liquors are found. We apply it now only to places, like saloons, so fitted up as to be a constant invitation to the public to buy and drink. So applied, the things we have held that the sheriff is authorized to do are nothing more than the defendant himself did in his efforts to enforce the law in the rural districts. In fact these are the very things that all faithful officers, who have really tried to enforce the

State ex rel. v. Reichman.

law, have found it necessary to do and have done for years. There has been an impression that such officers were, in fact exceeding their lawful authority. It is time they were authoritatively advised that, in doing these things, so long as they do not abuse their power they have the full sanction and protection of the law.

We are not unmindful of the contention of counsel that an officer has no right to arrest, without a warrant, for a misdemeanor not committed in his presence. That rule is too well understood to require the citation of authorities. Nor do we mean to depart from it. But, under the statute quoted, an arrest may lawfully be made when no misdemeanor has in fact been committed if it is necessary to prevent a threatened breach of the peace. Whatever is a violation of public order or tends to the disturbance of public peace or order is a breach of the peace. In the judgment of the Legislature, the sale of intoxicating liquors is such a violation of good order and so tends to the disturbance of public peace and order that laws have been enacted prohibiting such sales. A violation of these laws undoubtedly violates good order and tends to the disturbance of public peace and order, and, by all the accepted rules of construction and of logic, is a breach of the peace.

For any misdemeanor, whether also a breach of the peace or not, actually committed, no arrest can be made without a warrant, unless the offense is committed in the presence of the arresting officer. But to prevent any offense which is a breach of the peace, threat-

ened in the presence of an officer an arrest may be made without a warrant. So, to arrest for a sale of liquor, not made in his presence, an officer must have a warrant. But to prevent such a sale, when threatened in his presence, he needs no warrant. Hence when he finds a man in possession of a saloon, with everything ready to serve customers, such a man is undoubtedly threatening, in the presence of an officer, a breach of the peace which he will commit unless prevented. We have no hesitancy in holding that it is the duty of the officer to prevent the breach of the peace by making an arrest. It cannot be that an officer of the law must stand powerless in the presence of complete preparations for a breach of the peace which is sure to be committed as soon as he is out of sight.

Moreover, as we have seen, when the sheriff has notice that an offense is being committed, it is his duty to act in prevention and suppression. This involves the duty to, at least, make some investigation to ascertain the facts. That defendant had notice that saloons were running in Memphis, we do not doubt from the record. And it is impossible that, with saloons running as the record shows they were, the sheriff and his deputies could not, with slight effort, have put themselves in possession of sufficient knowledge to satisfy a justice of the peace that the offense of selling liquor had been committed. Nor do we understand that it was necessary for the officers to actually see sales before swearing out warrants. We are aware that State v. Good, 9 Lea, 240, holds that when the infor-

State ex rel. v. Reichman.

mant does not know the facts, but has only been informed of them, the justice of the peace is not authorized to issue the warrant. But if any officer knows the facts which reasonably lead to the conclusion that sales of liquor have been made, he is within the rule laid down in that case and is justified in swearing out a warrant, although he may not have actually seen the sales.

We have said that the sheriff is not bound to maintain a detective force. It is also true that there is no statute which, in terms, makes it his duty to swear out warrants or give information to the grand jury. But when he is commanded to prevent and suppress crimes, public offenses, and breaches of the peace, it is incumbent on him to use all the means which the law has provided to accomplish that end. If complaint is made to him or he has notice that an offense has been committed, or is about to be committed, it is his duty to investigate. If an offense is committed or a breach of the peace threatened in his presence, it is his duty to arrest without a warrant. If, upon investigation, he learns facts which show that an offense has been committed, it is his duty to swear out a warrant and make the arrest. If he has reason to believe that an offense has been committed, but does not know facts sufficient to justify his swearing out a warrant, it is his duty to report the matter to the grand jury for investigation. Nothing short of this will be a complete performance of his duty to prevent and suppress crime and public offenses.

State ex rel. v. Reichman.

Has the defendant neglected to perform the du-
ties of his office as thus fixed by the law? So far as the
county outside of the limits of the city of Memphis is
concerned, with a single exception, we think he has not.
And, as to this part of the county, his conception of the
duties of his office was just about as ·we have stated
them to be. Some criticism is made of his conduct with
respect to the sale of liquor at certain roadhouses. But
it appears that he made numerous arrests, a number of
raids, destroyed considerable quantities of liquors, and
secured many indictments. On the whole we think he
acted in good faith and with reasonable vigor in the
effort to enforce the liquor laws outside of the city of
Memphis with a single exception to be now referred to.

The Tri-State Fair was held in September, 1914, just
outside the limits of Memphis. At some time between
defendant's election, in August, 1914, and his induction
into office on September 1st, in a conference at which
he (Mayor Crump) and the chief of police of Memphis
were present, he was asked if he would permit liquor
to be sold on the fair grounds. He at first replied that
he would not, as that would be a prostitution of his
office. But, after some remarks by the mayor, he said
that if as many as ten of the directors of the fair would
ask it in writing, he would agree. This is the version
as given by the chief of police. The defendant does
not deny it and Mr. Crump was not called as a witness.
The chancellor accepted it as true, as do we also. It
does not appear that the petition suggested was ever
signed or presented. But it does appear that beer and

whisky were sold openly on the grounds during the fair, and that defendant was present and could not have been ignorant of the sales, though he may have avoided actually seeing them.    The agreement, made before he became sheriff, could not be made a ground for his removal, unless it was afterwards carried out. We do not know whether the directors ever signed a petition as suggested, nor do we know that defendant ever formally waived the petition as a condition to his agreement.    But whether by his express agreement or not, intoxicating liquors were sold  openly  on the grounds, and he was present and took no steps to prevent it.

In the city of Memphis, defendant admits that he did nothing toward enforcing the liquor laws except to serve such process, principally in injunction cases, as was placed in his hands.    He was personally and politically on the most intimate terms with the mayor of Memphis.    Whether by formal agreement or tacit understanding or on his own motion, it is manifest, from his own testimony, that he was content to leave the enforcement or nonenforcement of the laws against selling intoxicating liquors entirely to the city authorities. At the same time he admits that he knew that, from September 1, 1914, to January 29, 1915, the city authorities were making no effort to enforce these laws, and that, from May to October, 1915, they were merely arresting liquor dealers, collecting $50 from each, and binding none of them over to the grand jury.    His fail-

ure to act, under these circumstances, was a clear neg- lect to perform the duties of his office.

The excuse is offered that, when he was inducted into office the state was proceeding against liquor dealers by injunction suits and that this was the most effective weapon against them. But this is only an additional means of enforcing the law and relieves no officer of any of the ordinary duties of his office.

It is also urged, in excuse, that the officials of the criminal court were so derelict in the discharge of their duties that nothing would have been accomplished by having offenders bound over to the grand jury. But, however, this may have been, the derelictions of other officials cannot excuse him for failure to do what the law plainly required him to do for the prevention of public offenses. Besides it is conceded that, during a portion of his term, the chancery courts were very active and the counsel employed by the Governor very energetic in proceeding against dealers by injunction. In these proceedings, defendant gave no aid except to serve process. If he really desired to enforce the law and felt that his efforts were being obstructed in the criminal court, a report to the official in charge of these proceedings would have brought most effective aid. It is said, however, that the Nuisance Act does not impose any duty on him. It is true that act does not mention the sheriff, and he is not authorized to institute any proceeding under it. But neither is there any act which, in terms, says that he shall, under any circumstances, swear out a warrant or give information to the

State ex rel. v. Reichman.

grand jury and, counsel say, no statute says that he shall ever make an arrest without a warrant; the only provision being that he may do so in certain cases. But he is commanded to preserve the peace and prevent and suppress public offenses.  And we hold that this makes it his duty to use all the machinery which the law provides to accomplish that result.  It is his duty to co-operate with all other officials who are charged with duties looking to the same end.  If, therefore, he found that the enforcement of the law was being obstructed in the criminal court, while this would not relieve him of the duty to have offenders bound over, it would impose the additional duty of enlisting the aid of those in charge of injunction suits.

In reaching these conclusions, we have not, we think, put any harsh or strained construction on the law.  We have only held that the sheriff must be a real conservator of the peace and, to that end, must, in good faith, use all the power which the law gives him to prevent and suppress public offenses.

It is not to be expected that any sheriff can so conduct his office that no liquor will be sold in his county any more than that there will be no such crimes as larceny, disturbing public worship, or assault and battery.  And no sheriff who, with reasonable intelligence, makes an honest effort to prevent and suppress public offenses of all kinds has anything to fear from the courts.

The inquiry of counsel as to what defendant could have lawfully done is a pertinent one.  We have no

right to condemn him, unless we can show what the law made it his duty to do. But what we have said furnishes, we think, a denite answer to that question. We have no doubt, from the record that, during at least a portion of his term he had notice that a number of saloons were being run openly and that the city authorities were doing nothing to suppress them. It is equally clear that no efforts were being made to conceal their operations from his force. What could he and his deputies have done? (1) They had only to step into these places, observe a sale, and make an arrest for an offense committed in their presence, or if they found the place ready for business, but saw no sales made, they could have made an arrest for a breach of the peace threatened in their presence, and could then have seized the liquor or closed the place, as under the circumstances, would have been reasonably necessary to prevent sales being made. (2) With notice of these open saloons a slight investigation would have put his deputies in position to swear out warrants. (3) If his efforts had been obstructed in the criminal court, he could have reported to the official in charge of injunction suits and secured effective aid.

We have not overlooked the authorities cited by counsel but have considered them. Most of them are not in conflict with what we have held.

*Commonwealth* v. *Wright*, 158 Mass. 149, 33 N. E. 82, 19 L. R. A. 206, 35 Am. St. Rep. 475, simply holds that for statutory misdemeanors, not amounting to a breach of the peace, an officer has no authority to ar-

rest without a warrant, though the offense be committed in his presence, "unless it is given by statute." But our statute extends the authority to all "public offenses."

*Pinkerton* v. *Verberg*, 78 Mich. 573, 44 N. W. 579, 7 L. R. A. 507, 18 Am. St. Rep. 473, holds that a police officer cannot, without a warrant, lawfully arrest a woman upon mere suspicion that she is on the street for the purpose of plying her vocation as a prostitute.

*Jamison* v. *Gaernett*, 10 Bush (Ky.) 221, merely denies the power of an officer to arrest, without warrant, for an assault not committed in his presence.

*Robison* v. *Minor*, 68 Mich. 549, 37 N. W. 21, and 8 Ruling Case Law, p. 258, citing a Florida case holding that carrying concealed weapons is not a breach of the peace, as well as some other cases, not cited, but which we have examined, are, in principle, more or less in conflict with our holding that the unlawful selling of liquor is a breach of the peace. But, we think, they are not supported by the weight of authority or reason.

It is not necessary to discuss other charges of the bill further than to say, in fairness to defendant, that we do not find that the charges of official oppression and demanding and receiving illegal fees are sustained by the record.

For the reasons stated, the decree of the chancellor must be reversed, and a decree entered here, removing defendant from the office of sheriff of Shelby county.

In the record of this case, no effort has been made to comply with the rule requiring bills of exceptions

to state the evidence in narrative and condensed form. Nor has any abstract of the evidence been filed. The bill of exceptions consists of a literal transcript of what occurred on the trial, including numerous lengthy arguments by counsel, making six large volumes. It is insisted by defendant's counsel that the court ought not to examine the testimony, but should decide the case on the facts set out in the opinion of the chancellor. In view of the summary character of this proceeding and the expressed purpose of the legislature that it should speedily be disposed of on its merits, and the short time between the trials below and here, we have not done this, but have examined the entire record. Our conclusions in the main, are based however, on the facts found by the chancellor to be true.

But we do not think the additional cost resulting from failure to comply with the rule should be borne by the defendant. Three-fourths of the cost of the transcript will be taxed against Shelby county. The remainder of the costs of this court as well as the costs of the court below will be paid by the defendant.