a matter of law, she did not take, and could not and did not by her will and by her attempted devise, found at Item Second thereof, vest any title in this plaintiff. The only heir of Albert, so far as we are informed, who could take under the devise in the will of Josephine Sullivan was Mary Baber Jackson. Whether or not Mary Baber Jackson is now the owner of lot 338 as against her aunt Laura we do not decide.

Not finding that this plaintiff is a tenant in common in this real estate, and therefore finding that it would be improper to decree partition, the case is dismissed.

Common Pleas Court of Cuyahoga County.

IN RE PETITION FOR REMOVAL OF JOHN M. SULZMANN.

Decided December 22, 1931.

*Benjamin C. Boer, J. C. McClelland, Roy Wilt* and *Lester L. Yoder* for complainants.

*Day & Day, Luther Day, D. W. Kling* and *G. H. Rudolph* for respondent.

OVERMYER, J. (of Sandusky County, sitting by assignment).

These proceedings, known as ouster proceedings, were begun and prosecuted under favor of Section 10-1 *et seq.* of the General Code, enacted under authority of Section 38, Article II of the Constitution, and the purpose and object of the proceedings is the removal from office of the sheriff of this county on the grounds, as alleged in the complaints, that he

1—Has refused and willfully neglected to enforce the law;

2—Has refused and willfully neglected to perform official duties imposed on him by law;

3—Is guilty of gross neglect of duty and of misfeasance, malfeasance and non-feasance in office in the following respects, etc.; and the charge is then specifically set out that he "knowingly permitted, suffered and consented to notorious and open betting—gambling, gaming and the making of wagers for money" at North Randall and Thistle Down race tracks in this county between certain dates in 1931, contrary to Section 13059 General Code; "that he knowingly permitted, suffered and consented to the notorious and open keeping and operation of a building" at said race tracks with apparatus, books and devices for recording wagers on said horse races, contrary to Section 13062 General Code; and "knowingly permitted, suffered and consented to the notorious and open sale of tickets" to be used in said wagering and betting on said horse races, contrary to Section 13063 General Code; all against the peace and dignity of the State of Ohio. The complaints allege the respondent

guilty of misconduct in office and ask a judgment of forfeiture against him.

A full hearing was had before this court on these charges, and the statute referred to requires the court to file a full statement of its finding in the case with the reasons for such finding, with the clerk.

At the outset of the hearing the respondent challenged the sufficiency of the petitions on two general grounds, first, that a notary public who himself had signed a petition and was active in securing signers and circulating the petitions was disqualified from taking the acknowledgment of the circulators, and second, that the required number of names of qualified electors (1,000) did not appear on the petitions.

The court overruled the first ground of objection, and made a ruling as to the meaning of the phrase "qualified electors" as used in Section 10-2, and no further evidence was offered as to the insufficiency of the petitions, and the court find the petitions sufficient to confer jurisdiction.

The respondent denied the charges of misconduct in office, but admitted that there was horse racing at the places and times alleged, that there was gaming or betting or wagering on the results of said races, and that he had knowledge thereof at the time, and the evidence shows that complaints were made to him by several persons, and appeals were made to him to stop the gambling at the time. The legal defense presented was that it was not his duty to interfere with said races or the wagering and betting connected therewith; that said wagering or betting on said races, and the ticket selling and devices, pool selling, etc., connected therewith, are not offenses against the "public peace" of the county, and that his duties as sheriff require him to act only when the "public peace" is threatened.

His counsel claimed that the respondent had no right to interfere therewith and that he would have been liable on his official bond if he had interfered, but on the witness stand the respondent admitted that he had assumed to exercise jurisdiction over all racing in the county and had issued "permits" to North Randall, Cranwood and

Thistledown tracks to operate for a limited time and refused a "permit" to other tracks to operate for "economic reasons." He says these "permits" were oral, simply his oral consent to several and oral refusal to others.

One of the grounds for removal of a public official set out in Section 10-1 General Code is "willfully and flagrantly exercising authority or power not authorized by law," but this specific charge was not made against the respondent in the complaint. The court has the right, however, to consider his testimony on this point on the question of willful conduct as to the other charges.

If, as his counsel contended, the respondent had no right to interfere with the races and the gambling connected therewith because they are not offenses against the "public peace," then he was clearly exercising unauthorized authority when he determined which tracks could operate and which could not, how long they could operate, and finally granted a week's extension on condition that the proceeds of one day be devoted to charity, all of which he admitted.

The legal defense pleaded and ably and eloquently argued by his counsel, and the defense offered by the respondent himself on the witness stand, are rather inconsistent.

To meet this inconsistency his counsel urge that respondent did not know what his rights and duties in the premises were; that the statutes defining the duties of a sheriff have not been construed, and that the respondent being in doubt as to his duties under the law he could not be held to have willfully violated his oath or willfully neglected his official duties and therefore could not be guilty of misconduct in office as charged.

This claim merits careful consideration, although the respondent on the witness stand practically refuted this claim when he admitted having said that he would "assist any legislator in his effort by introducing a bill in the State Legislature to legalize horse race betting," thus admitting that he knows now and knew last summer that horse race betting was illegal and he was willing to help legalize it.

The statute under which this proceeding is brought, Section 10-1 General Code, is quite general and does not undertake to say what shall and what shall not constitute a "willful neglect to enforce the law," etc., and leaves to other provisions of the law to determine what the duties of a particular office are. The courts of Ohio have not undertaken to set out in any one decision the duties of a county sheriff, and the few cases to be found on the subject only pass on the particular questions raised in that case.

It has been held, for example, that a judge cannot be guilty of failing to "enforce" the law, because the law does not make him an "enforcement officer." *Staples* v. *Sprague*, 31 O.L.R. 120. But in the same case it is held that the sheriff is a law enforcement officer, and says that,

"The one charged with the duty of enforcing the law must put in motion the processes of the law, which so far as criminal law is concerned means the filing of a complaint and the issuance of a warrant."

Very exhaustive briefs were filed by counsel on both sides, in addition to able and comprehensive oral arguments, in which are traced the early origins of the office of sheriff and a full discussion presented of the duties of a sheriff under the common law and the statutes of Ohio and other states. To review these authorities in this opinion would be impractical and cumbersome. I will, therefore, set forth only the conclusions reached after a full and careful study of these briefs and authorities cited. My conclusions based on authorities, and on reason are:

First—That in Ohio the sheriff is the chief law enforcement officer in the county, with jurisdiction co-extensive with the county, including all municipalities and townships.

Second—That in municipalities the sheriff and the mayor stand on an equality as law enforcement officers so far as state laws are concerned, and neither is permitted to cast the burden of action on the other. Failure or refusal of the mayor to act would not reduce or excuse the responsibility of the sheriff.

The following are among the authorities supporting this view:

As to duties of sheriff under common law, Sewell, Law of the Sheriff, page 30; Murfee on Sheriffs, page 639; Hale's Pleas of the Crown, foot-note, page 69.

Section 2834 General Code of Ohio, provides that the sheriff shall "exercise the powers conferred and perform the duties enjoined upon him by statute and by the common law."

*Staples* v. *Sprague,* 31 O.L.R. 120. .*Seltzer* v. *State,* 31 O.L.R. 394; 8 Abs. 185 *et seq.* 59 U. S. 396. 141 S. E. 237. 135 Tenn. 653. 246 Fed. 851. 235 Pac. 227. 24 R. C. L. 916. 58-61 U. S. Sup. Ct. Rep. 396. 179 Pac. 309, where the Supreme Court of Kansas says:

"The sheriff is the state's chief executive and administrative officer in his county and in the exercise of his function in conserving the public peace, in vindicating the law and in preserving the rights of the government he represents the sovereignty of the state and has no superior in his county."

See also 235 Pac. 227.

Horse racing for purses or prizes itself is not a crime, and when legitimately conducted is a thrilling and popular sport. But gambling on horse races, wagering, betting, book-making, as the undisputed evidence in the case shows was openly engaged in on a large scale at both race meetings referred to, is a crime and in the view of this court is a crime against the public peace.

It is a crime of such seriousness and followed by such evil consequences that the legislature of many states, in addition to our own, have passed laws prohibiting it. The Court of Appeals of this district in *Seltzer* v. *State,* 31 O. L. R., 394; 8 Abs. 121, say:

"The greatest evil that confronts our people today is the habit of gambling. It is the forerunner of crime. It is the breaking down of the morals of the people," and that court was speaking of gambling on horse races at the same Thistle Down track when they said this. I will refer to other points in the Court of Appeals decision later.

Now, if the sheriff is the chief law enforcement officer of the county, and if his jurisdiction in the municipality of North Randall, where both of these tracks are located,

is on a par as an enforcement officer with that of the mayor of that municipality, and if, as he admits, he had knowledge that gambling was going on there, what was his duty?

His counsel argue that he was not required to do anything because gambling is not a breach of the "public peace," and that he need act only when the "public peace" is threatened, because gambling is not included in the code chapter on "Offenses Against the Public Peace." Section 2833, General Code, provides that "Each sheriff shall preserve the public peace," etc., while the statutes referring to the duties of constables, marshals, watchmen, police officers, etc., refer to them as "peace officers" and not "public peace" officers. From this fact it is urged that the sheriff need act only when there is an uprising or disquietude of a general nature in his county, perhaps a riot, or lynching, or other public violence.

I should not want to be the court that would lay down this rule of duty for the sheriffs of Ohio, nor should I want the task of explaining to the citizen on the street the difference between "peace" and "public peace."

The courts of Ohio hold a sheriff to be a law enforcement officer, and it is the view of this court that this means he shall enforce all state laws within his county, including the laws against gambling. As the chief law enforcement officer of the county he is the only officer in the county who directly represents the sovereignty of the state; he and the mayors of the municipalities are the arms of the governor in the executive branch of the state government and the enforcement of state laws. To hold that he shall be only a "process server" and shall be active only in enforcing the laws of the state when great physical outbursts are threatened, would be robbing the executive of the state of 88 assistants in the enforcement of law and would leave our citizens still more helpless under the assaults of organized crime.

Of course as the Supreme Court of Tennessee says, 135 Tenn. page 665,

"We do not mean that it is his (sheriff's) duty to patrol the county as the streets of the city are patrolled by the police, or to maintain a detective force to ferret out crime. All we now decide is that it is the duty of the sheriff and his deputies to keep their eyes open for

evidence of public offenses, and that it is a distinct neglect of duty for them to ignore common knowledge of law violation or to intentionally avoid being where they have reason to believe that such offenses are being committed * * * We hold that knowledge coming to him from any source is 'notice' within the meaning of this statute * * * he may not stand passive and see the laws of the state trampled upon * * * for the enforcement of those laws intended for the protection of the public at large, and in which no one citizen has any more direct interest than another, practically the sole reliance must be upon those officers who are made the guardians of the peace of the state, chief among whom is the sheriff."

To find authority for the view that a sheriff's duties are not thus limited and that he has authority and an active duty to perform in suppressing gambling at the very race tracks in question, I need go no further than the opinion of the Court of Appeals of this district in the case above referred to, viz *Seltzer, et al, v. State,* 31 O.L.R., 394; 8 Abs. 121, from which I quote:

In the opinion, discussing demands made upon a former sheriff of this county to stop gambling at Thistle Down Track, the court says:

"* * * and one must say that the men who have these things in charge are very resourceful and have political influence, and apparently all of that influence and adroitness was used upon the sheriff to prevent him from enforcing the statute * * *" The sheriff had vacillated from one post to another, and we learn from this record that on the 10th day of July, at 2 o'clock in the afternoon, a series of races were to be held at the Thistle Down track, and the contribution system was to be used, and apparently the sheriff had been told by the very able counsel in the prosecutor's office that such a system was illegal and was prohibited by law * * *. Apparently those promoting the races had information that the sheriff had been led to see through the thin veneer of the so-called contribution system, and that he was going to call it gambling and was going to perform his duties," etc.

And further the court says:

"Now this was the situation on the 10th. Fortunately for Cuyahoga County it had a man who had been on both

the Common Pleas and Court of Appeals benches as the first assistant prosecuting attorney, Mr. Lieghley, and he at once saw through the so-called injunction and told the sheriff that the injunction was not worth the paper upon which it was written, and that he should go on and perform his duties, which the sheriff did, and went to the race track and closed up the races and all the horses and paraphernalia used in racing and betting was removed from the tracks."

And further the court says:

"The sheriff, if he was enjoined, treated the paper that had been served upon him as of no importance, as a mere blank piece of paper and, ignoring it, performed his duties."

And further, "When one thinks of a judicial officer granting an injunction to prevent an officer, elected and sworn to enforce the criminal law * * * an injunction against said officer performing his duty," etc.

There is not a suggestion in the entire foregoing opinion that the former sheriff did not have the power or the authority, or that it was not his active duty to do the very things which the present sheriff is here charged with neglecting to do, and openly admits having failed and neglected to do, but every indication and suggestion is that that court never doubted the sheriff's power, authority and sworn duty to do them.

Some reference was made in argument to the motives prompting these complaints and charges, but whatever may be the motives lurking in the background of these proceedings, even if known, this would not help the court in deciding the law of the case, and it cannot be claimed that the 2,000 and more citizens who signed these complaints were all acting in bad faith.

Nor does it make this court's task any easier because many otherwise peaceful citizens do not look upon gambling at horse races as a very grave offense. Fortunately for them, they are not called upon as this court is to write a legal opinion on the subject. As Judge Mauck says in *Staley* v. *Sprague,* 31 O.L.R., at page 126:

"Whatever may be the individual's attitude toward a particular law, and however it may differ with the char-

acteristics of the individual and the nature of the particular law, the duty of the judge never varies."

The judge must hold to the law as he sees it and understands it.

Under the undisputed evidence in this case, and the admissions and declarations of the respondent under oath in open court, the court find the respondent guilty of refusing and neglecting to enforce the law; of refusing and neglecting to perform official duties imposed on him by law; of gross neglect of duty, and nonfeasance in office.

It is argued that respondent's neglect of duty, if any, was not willful.

"The word 'willful' used in respect to misconduct warranting the removal of an officer is used in the sense of a conscious and intentional failure or refusal to perform or keep inviolate any duty imposed upon the officer by law." 221 Pac., 139.

"We have accordingly based his (sheriff's) removal upon his total and intentional neglect of any effort to suppress saloons or other places where liquor was sold openly." 135 Tenn., 635.

"Misconduct in office does not necessarily imply corruption or criminal intention. The official doing of a wrongful act or official neglect to do an act which ought to have been done, will constitute the offense, although there was no corrupt or malicious motive."

Meecham on Public Officers, Section 457:

"Words and Phrases" defines nonfeasance as an "omission to perform a required duty at all, or a total neglect of duty."

Taking the foregoing definitions into consideration together with the following excerpts from the respondent's testimony, there can be no doubt that his neglect to enforce the law at the race tracks was willful and intentional, viz.:

"Q. Mr. Sulzmann, you realized, prior to the time you were elected sheriff of this county that betting on horse races was illegal, didn't you?
A. Sure I did.
Q. In fact, you made a statement prior to your elec-

tion that if you were elected you would undertake to have it legalized?

A. I did not. I made this statement, if my memory serves me right, that I would assist any legislator in his effort or honest methods by introducing a bill in the state Legislature to legalize horse race betting.

Q. So that you knew throughout the term of your office that not only was betting as a general practice going on at the races, but that it was illegal?

A. Only by common knowledge and rumor."

Then he was asked if it was not a matter of common knowledge that betting was going on at the tracks and he answered:

"Well, when you sell twenty to thirty · thousand news copies a night bringing the message to the people in the way of race horse meets, certainly every boy in the eighth grade, I should think, would have knowledge that there was something doing at the different tracks.

Q. So you had knowledge of it in some manner?

A. Just by report, rumor and common knowledge."

On the matter of "permits," he testified:

"Q. · To whom did they make the application?

A. To the sheriff's office.

Q. In what form did the applications come?

A. Verbally.

Q. And no applications came, I take it, from the other tracks?

A. No, sir. Appeals were made.

Q. And in what respect did the appeals differ from the applications?

A. I used my own judgment on that matter * * * Now for economic reasons I granted the privilege for the operation of the three tracks * * * and that is the reason I only permitted them to run as long as they did, and Cranwood I extended one week * * * Mr. Pahlman wanted to run at the Brooklyn track, I told him three tracks were sufficient * * * I told him under no consideration could he operate his tracks, for economic reasons.

Q. Did you fix the number of days which these three tracks would be permitted to run?

A. They presented their schedules and I O. K.'d them."

Further, in answer to a question he said:

"I have the right, understand, to acquiesce in a schedule; as sheriff of Cuyahoga county I can prohibit any horse to run."

Further in answer, he said:

"I told you I reserved the right to fix the schedule, and I reserved the right to permit one, two, three, four, five, six, if there are six, to run or not to run."

I deem it unnecessary to say more.

The respondent, knowing that betting and gambling was going on, constituted himself in effect the self-appointed race-gambling commissioner of Cuyahoga county, issuing and refusing permits as he saw fit, knowingly permitted open gambling and wagering at the meetings he graciously allowed to operate, and when appeals were made to step in and stop the gambling he wholly neglected not only to stop it but never made a move to investigate the matter. This constitutes refusal and willful neglect to enforce the law, willful neglect to perform duties imposed on him by law, nonfeasance, and, therefore, misconduct in office.

To say that he did not know what his duties were and, therefore, could not willfully neglect them, is an evasion and not a defense. The law requires him to know his duties and fearlessly perform them. The county prosecutor's office was open to him for counsel and would no doubt have advised him, as that office advised a former sheriff.

The statute under which this proceeding is brought provides but one penalty, viz.: Removal from office. Under the evidence and facts in this case the court has no alternative but to find respondent guilty; and when found guilty the court has no alternative but to enter a judgment of forfeiture of office against the respondent.

The court do find the respondent guilty of misconduct in office and an order of forfeiture of office will be entered. Exceptions will be entered for respondent, and an entry may be prepared in accordance therewith.