## PHŒNIX-BUTTES GOLD MINING CO. v. WINSTEAD et al.

(District Court, N. D. California, Second Division. April 9, 1914.)

**1. EQUITY ⌀315—PLEADING—ANSWER—VERIFICATION—OBJECTION.**

Where the answer raised the question of the court's jurisdiction, which the court was bound under the statute to take cognizance of independently of a plea, its failure to conform to Equity Rule No. 31 (old), in that it was not certified by counsel or separately verified, was immaterial.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 617, 619; Dec. Dig. ⌀315.]

**2. COURTS ⌀316—UNITED STATES COURTS—COLLUSION—DISMISSAL.**

On a bill by a mining company against citizens of California, evidence *held* to show that the action was collusive, in that the plaintiff company was organized under the laws of Nevada by citizens and residents of California for the purpose of conferring jurisdiction on the District Court on the ground of diversity of citizenship, so that the court was without jurisdiction and would dismiss the bill.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 862; Dec. Dig. ⌀316.]

**3. COURTS ⌀325—JURISDICTION—DISMISSAL—WAIVER.**

In such case, it was not inequitable to permit the defendant to take advantage of the objection that the bill had been collusively brought after he had voluntarily gone to trial on the merits and taken his chances upon a favorable issue, since the matter was not within the discretionary power of the court, and since defendant's action was consistent with the legal proprieties.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 884; Dec. Dig. ⌀325.]

In Equity. Bill by the Phœnix-Buttes Gold Mining Company against Charles J. Winstead and others. Dismissed.

James L. Crittenden, of San Francisco, Cal., for plaintiff.

Frank R. Wehe, of San Francisco, Cal., and W. I. Redding, of Downieville, Cal., for defendants.

⌀For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

VAN FLEET, District Judge. This is a bill filed here by the plaintiff, a corporation organized under the laws of the state of Nevada, to quiet its alleged title as against the defendants, residents and citizens of the state of California, to certain mining property situated in the county of Sierra in this state, and to enjoin the defendants and each of them from further asserting an interest in or title thereto. Coupled with matter responsive to the merits, the answer, of defendant Winstead sets up a plea or challenge to the jurisdiction of this court and the right of the plaintiff to maintain the action therein upon the ground that the action is collusive, it being alleged, in substance, that plaintiff was organized under the laws of the state of Nevada by its present stockholders, all residents and citizens of this state, and was given a conveyance of the property described in the bill, solely for the purpose of conferring jurisdiction of the action upon this court; that the conveyance of the property was fictitious and had for the purpose of giving color to such jurisdiction as of a case of diverse citizenship, whereas such steps were taken as the result of a conspiracy between said parties for the purpose of securing a trial of their rights to the property away from the locality where it is situated, to give them an advantage over defendants; and that the real jurisdiction of the action is in the superior court of Sierra county.

[1] Without the question of its jurisdiction being brought to the attention of the court for preliminary disposition, the cause was referred to the standing master to take the evidence and report findings of fact and conclusions of law; but, upon the hearing coming on before the master, the plaintiff objected to a consideration by him of that question and asked that it be ignored, upon the ground that that feature of the answer did not conform to Equity Rule No. 31 (old) in force when the pleading was filed, in that it was not certified by counsel or separately verified. The master properly ruled that as the question was raised by the answer, and was one which the court was bound under the statute to take cognizance of independently of a plea, the formal sufficiency of the pleading under the rule was not material. Williams v. Nottawa, 104 U. S. 209, 211, 26 L. Ed. 719; Lehigh Mining Co. v. Kelly, 160 U. S. 327, 16 Sup. Ct. 307, 40 L. Ed. 444; Miller & Lux v. East Side Canal Co., 211 U. S. 293, 29 Sup. Ct. 111, 53 L. Ed. 189. And, as the order of reference was general and covered all the issues, he should proceed to take the evidence upon that question with the others and include it in his findings. The case proceeded to a hearing and report, and on the question of the jurisdiction the master found:

"Eleventh. That said Phœnix-Buttes Gold Mining Company was formed, organized, and incorporated as a corporation by and under the laws of the state of Nevada in good faith by the incorporators thereof, and was not so incorporated for the purpose of giving this court jurisdiction of this action or to defeat, or for the purpose of defeating, the jurisdiction of the said superior court of the county of Sierra."

The defendants have excepted to this finding as unsupported by the evidence, and, after a careful and painstaking examination of the

evidence in the record, I am reluctantly constrained to the conclusion that the exception must be sustained.

The master's findings are accompanied by an opinion embodying a discussion by him of the evidence upon which his findings and conclusions are based, and with reference to the subject of this particular finding, after some preliminary remarks as to the manner of raising the question, he says:

"Prior to the formation of the complainant corporation, it appears that a corporation had been organized under similar name, a corporation of California, by the Kane heirs and others for the purpose of taking over this property: the conveyance was never made, and some months later the complainant corporation was organized and acquired the property in suit. The only evidence which goes to show a fraud on the jurisdiction of the court is that of the witness Daveler, who was president of the first corporation and was left out of the second. He testifies rather indefinitely to a conversation with Wittenmyer, then an attorney for the California corporation, that 'they were going to attempt to organize under the laws of the state of Nevada or some other state in order, if there is a lawsuit, to have it tried in the federal court.' Mr. Wittenmyer does not support him further than to say that he had discussed it with Mr. Daveler but advised against it."

And after referring to the testimony of the incorporators of plaintiff, in substance that they incorporated under the laws of Nevada on the advice of their attorney so that the stock could be made non-assessable, he briefly concludes:

"It is apparent that these ladies incorporated in good faith under the laws of another state for reasons which their attorney deemed proper, and as they had a right to do, and not to defeat the jurisdiction of the state court in Sierra county."

While the finding of the master is not to be lightly set aside or disregarded, and his views as expressed in his report are justly entitled to great respect, these considerations should not deter the court from correcting manifest error in his conclusions, either of fact or law. In this instance the statement by the master of the purport and effect of the evidence upon which he bases his finding does not, in my judgment, fully or adequately present the case. It fails to take account of some of its most material and serious aspects directly affecting the question involved in the finding, and indicates that the master has unconsciously permitted his mind to give undue effect to declarations largely of a negative character by interested witnesses, to the exclusion of very significant facts and circumstances, largely uncontroverted, growing out of the relations of the parties to the property and to each other at and prior to the taking of the steps which constitute the subject of inquiry and which are, I think, of a nature that cannot justly be ignored in passing upon the bona fides of the transaction. This will be better appreciated, perhaps, from a more full and complete statement of the facts disclosed in the somewhat voluminous record.

August C. Busch was for some years the owner of all the property in suit, consisting of valuable mines and mining claims, quartz mills and other buildings, flume, water, and water rights connected therewith. Busch got into financial difficulties while working the property, and liens were asserted against it by the miners, and litigation to enforce them followed. As a result, the property passed under fore-

closure into the hands of a trustee for the benefit of the lienholders, and Busch went into bankruptcy. After repeated efforts of the trustee to dispose of the property at a higher figure, it was finally taken over by James Kane for a consideration of $4,000. Kane had been a close and warm friend of Busch and his wife for many years in Sierra county, and there is evidence tending to show that Kane, who had removed to San Francisco, bought the property, not so much for his own benefit as to help Busch, and that the latter or Mrs. Busch was to have an interest in anything that could be realized from a sale or disposition of the property over the amount paid by Kane. While the deed was taken in his name, he never worked the property nor personally took it into his possession. He sent the deed to Busch, who took over the possession from the trustee, and Kane left the property in the possession and care of Busch up to the time of the latter's death, who did some work upon it and expended his own money in keeping it in repair. Up to the time of Busch's death in 1905, repeated efforts were made by Busch and Kane to find a purchaser for the property, but without success.

On the death of Busch, the defendant Winstead, a foster son of Busch, who had been raised in his family, took possession of the property in behalf of the claimed rights of his foster mother, to whom Busch had deeded his rights, and without apparent dissent or interference of Kane continued the care and protection of the property, doing some work in keeping the property in order and generally looking after it. During the life of Kane the latter and Winstead made further efforts to dispose of the property, and in these efforts, while claiming that he was the sole owner of the property; Kane's acts and declarations tended clearly to indicate that he was desirous of disposing of the property, not only for sufficient to get back the money he had invested in it, but to leave something for Mrs. Busch. Kane died in 1907, leaving no will, and the legal title to the property standing in his name devolved upon his next of kin, certain sisters, nephews, and nieces, who may be designated herein, as in the master's report, as the "Kane heirs," or Kane interest. Mrs. Busch subsequently died, leaving one-half of her asserted interest to Winstead, and he became her executor. Winstead continued to care for the property after the death of Kane and Mrs. Busch, and on two occasions relocated the water rights to keep them from being jumped. After the death of Kane, his heirs, finding Winstead in possession of the property and claiming an interest, with knowledge of the circumstances entered into negotiations with him to settle their respective rights, the result of which was a tentative agreement with Winstead that he should receive $12,500 and certain shares of stock in a corporation to be formed to take over the property and work it, in consideration of which Winstead was to surrender the possession of the property and deliver up the keys to the tunnels and buildings then held by him. This was early in 1910. Thereupon the Kane interest, apparently in accordance with their arrangement with Winstead, proceeded and organized a corporation under the laws of California, called the Phœnix Quartz Mining Company, to take title to the property and work it. Five of the

incorporators were Kane heirs, one (J. S. Daveler) a friend taken in by reason of his experience, and one (L. A. Wittenmyer) their attorney; the two latter having but a nominal interest. Daveler was made president. This was on July 13, 1910, and the corporation immediately received possession of the property from Winstead and proceeded for several months to open it up and work it. No deed to the property was actually passed to the corporation, although the evidence tends to show that one was prepared; nor was any stock issued to Winstead or any part of the cash consideration paid him, although the subject of his claimed interest was discussed by the directors and reference made in the minutes to the arrangement with reference to it.

But not long after getting possession of the property the Kanes, for reasons which do not clearly appear, employed another attorney. The latter went to Sierra county to examine into the title and visit the property. This was in August or September, 1910, as nearly as the evidence discloses, and was in company with Mr. Daveler, the president of the California corporation, and Mr. Wittenmyer, its then attorney, who up to that time had also acted as the attorney for the Kane heirs. Mr. Daveler testifies that on their way down from the mine he had a conversation with Mr. Wittenmyer in which the subject of reincorporating under the laws of Nevada was talked over between them. The substance may thus be given in the language of the witness:

"A. We were discussing in a general way how matters were going at the mine, and that conditions were not satisfactory. We had had the conversation with Mr. Winstead about the settlement of the affair. Then Mr. Wittenmyer said to me they were going to attempt to organize under the laws of the state of Nevada or some other state in order to get—if there is a lawsuit, have it tried in the federal court. * * * Q. And Mr. Wittenmyer made the remark to you about incorporating under the Nevada laws? A. Not he himself; not that he was to incorporate, but that there was a proposal on, he understood, to reincorporate under the laws of the state of Nevada. * * * Some of the directors of the company were not satisfied with their attorney, and Mr. Wittenmyer as attorney for the company had been up there at the time Mr. Crittenden was there, and there was—he said that they were going to reincorporate under the laws of the state of Nevada, or some other state, in order to have jurisdiction in the federal courts."

Mr. Wittenmyer, testifying on the same subject, with some apparent reluctance by reason of his previous relations with the Kane heirs, said in response to questions asked by plaintiff's attorney:

"Q. Did you have any interview with Mr. Daveler in the cars or in the stage on your way down from Sierra City to San Francisco? A. I presume we did. Q. In which you stated that there was a proposition to incorporate the company under the laws of another state with a view of conferring jurisdiction upon United States courts? A. I would rather have the consent of the Kane heirs before I answer that question."

Being reassured by the master, he said:

"A. Well, the question was brought up, and it was stated, although I do not believe there was any proposition to that effect, it was stated at that time that the jurisdiction could by incorporating in the state of Nevada be conferred upon the United States courts. Q. Did you make that statement to Mr. Daveler? A. It was not a statement; it was merely as Mr. Daveler went

up to that place we discussed a great many other things. Among others was the claim of Mr. Winstead upon the property, and the question as to the quieting of the title was discussed, as to whether a suit to quiet title would quiet the title to the property; and, if I recall it correctly, I said that I did not think it was worth the expense of going to quiet the title in the matter, that I thought it was far better, and my advice was, that Mr. Winstead's claim be settled and adjusted in the corporation without the suit to quiet title, and I think at that time he asked me about the jurisdiction it would be tried under, and I said it would be tried under the state courts in Sierra county, and he asked if it was not possible to have it tried in the United States court, and I said no, that it was impossible because it was not a controversy which the United States courts could take jurisdiction of, and then, if I recall correctly, he stated the case of some mining company of Nevada that had a claim that was tried in the United States courts here, and I stated the chances were it was a controversy between citizens of two different states, under which then the United States would take jurisdiction if the value was over a certain amount. As far as any definite statement was concerned, I do not believe there was any; it was merely the discussing of certain conditions. Q. Was that stated by you, that you contemplated forming a corporation with that view, or that one was contemplated? A. It was not stated that it was, because I had always advised against it."

It was shortly after this, on October 3, 1910, that the plaintiff corporation was organized; the articles of incorporation being subscribed on September 29th. The incorporators and directors were four members of the Kane interest and their attorney. Wittenmyer and Daveler were not included. The entire capital stock of the new corporation, excepting some 625 shares to the attorney as representing his fee for services, was all issued to the Kane heirs in proportion to their respective interests in the property, and, in consideration of this stock and the giving of two notes to members of the Kane interest who had advanced money to work the property, the Kane heirs conveyed the property to the plaintiff corporation. These steps were taken without notice to or knowledge on the part of Winstead, and with no provision for or apparent intention to take care of the interest claimed by him, but, as the circumstances clearly tend to show, with the purpose of ignoring him and not carrying out the arrangement or understanding previously had with him, through which the possession of the property had been secured, although officers of the corporation had repeatedly assured him that everything would be all right and the arrangement carried out. Thereafter on December 9, 1910, this bill was filed. Two or three of the plaintiff's directors testified with substantial identity that nothing was said at the meeting to organize plaintiff by their attorney or by anybody else about bringing a suit against Winstead or of incorporating under the laws of Nevada for the purpose of bringing any such suit; that they were advised by their attorney that their title to the property was perfect, and "to incorporate under the laws of Nevada for the protection of our personal rights and interests and also to issue nonassessable stock, * * * that the incorporation laws of California were not advantageous," and that those of Nevada were better, "that as ladies were the principal incorporators our interests should be protected," and that they had never heard of a purpose to bring a suit against Winstead until he posted notices on the mine, claiming the water rights.

One of them was on the stand, but was not interrogated on the sub-

ject. None of them stated any reasons, other than as above indicated, actuating them in making a conveyance of the property to the plaintiff corporation.

[2] These facts as they present themselves to my mind lend no substantial support to the master's finding, but, to the contrary, tend by overwhelming weight to sustain the claim that the incorporation of plaintiff and the transfer to it of the legal title to the property was not in good faith, but was for the purpose of conferring an apparent jurisdiction upon this court, which does not in right exist. Aside from strong objection renewed here to the formal sufficiency of the answer to raise the question of jurisdiction, which, as above indicated, is without merit, the great stress of the argument to sustain the finding is placed upon the evidence of plaintiff's incorporators that the purpose of conferring jurisdiction upon this court was never discussed between them, and that their action was solely in pursuance of the advice of counsel that they would thus protect themselves against personal liability as stockholders in the corporation. Whether or not such advice correctly stated the law (as to which see section 15, art. 12, Const. Cal.; section 322, Civil Code Cal.; Von Horst v. American Hop & Barley Co. [C. C.] 177 Fed. 976; Thomas v. Matthiessen, 232 U. S. 221, 34 Sup. Ct. 312, 58 L. Ed. 577 [Supreme Court of U. S., decided Feb. 2, 1914]) need not be considered; for, giving this evidence full effect for all it tends to establish, it is, I think, entirely overborne by the uncontroverted facts as to the situation of the parties at the time, especially when considered in the light of the evidence of Daveler and Wittenmyer, which, however indefinite as to detail, is in view of their relation to the parties very significant. Moreover, the evidence of plaintiff's directors is not in itself satisfactory. It tends to little more than negative the open discussion of any such purpose by the parties concerned. It is enough to say that such purposes may be, and as a rule are, arrived at in other ways. The further objection that there was no reason at the time these steps were taken to anticipate the bringing of the present action cannot, in view of the situation of the parties as to the property and the express understanding with Winstead, be seriously considered. It may be added that the element of bad faith in ignoring the proposed agreement of settlement with Winstead is of no slight significance in determining the purpose with which those steps were taken.

To my mind the facts bring the case clearly within the principles announced in the cases of Lehigh Mining, etc., Co. v. Kelly, and Miller & Lux v. East Side Canal Company, above referred to (and the cases there cited), where it was held that the actions were properly dismissed for want of jurisdiction by reason of collusion. The question is not whether the steps taken were formally sufficient to create the corporation plaintiff and vest in it the legal title to the property; the question is whether those steps have been taken in good faith and for the genuine purpose implied by filing the bill here, or have been taken with a view of having this court assume jurisdiction of a case which justly belongs elsewhere. Moss v. McCarthy (C. C.) 191 Fed. 202, 207, 208. As stated in Miller & Lux v. East Side Canal Co.:

"We do not intend by what has been said to qualify the general rule, long established, that the jurisdiction of a Circuit Court, when based on diverse citizenship, cannot be questioned upon the ground merely that a party's motive in acquiring citizenship in the state in which he sues was to invoke the jurisdiction of a federal court. But that rule is attended by the condition that the acquisition of such citizenship is real, with the purpose to establish a permanent domicil in the state of which he professes to be a citizen at the time of suit, and not fictitious or pretended."

And as further aptly said in that case:

"In the present case, although the Nevada corporation appeared, upon the face of the record, to be the owner of the rights which the California corporation had asserted in the state court, it was, when this suit was brought, only the representative of the California corporation and its stockholders. The latter corporation, holding all the stock and having the same directors and officers as the Nevada corporation, could control the suit brought by the Nevada corporation, and, in the event of a favorable decree, could have compelled it to surrender or abandon all its claims to the California corporation, which was still in existence when this suit was brought."

So here, as is readily perceived, the parties organizing the plaintiff corporation, although not identical, were to all essential intents and purposes the same as those who had organized the California corporation and possessed the same absolute control of the one as of the other. While the conveyance of the property was formally sufficient to vest the legal title in plaintiff, it was but a transposition upon paper; instead of holding the title in their own names, they now hold it in the name of a creature whose disposition of it can be wholly dictated and directed by them. At the conclusion of this litigation, they can require a reconveyance to themselves, or have it transferred to the California corporation, in accordance with their original design, as they may find most expedient for future purposes.

Speaking of a situation not materially different in its legal aspects, it is said in Lehigh Mining, etc., Co. v. Kelly:

"The conveyance to the Pennsylvania corporation was without any valuable consideration. It was a conveyance by one corporation to another corporation—the grantor representing certain stockholders, entitled collectively or as one body to do business under the name of the Virginia Coal & Iron Company, while the grantee represented the same stockholders, entitled collectively or as one body to do business under the name of the Lehigh Mining & Manufacturing Company. It is true that the technical legal title to the lands in controversy is, for the time, in the Pennsylvania corporation. It is also true that there was no formal agreement upon the part of that corporation 'as an artificial being, invisible, intangible, and existing only in contemplation of law,' that the title should ever be reconveyed to the Virginia corporation. But when the inquiry involves the jurisdiction of a federal court—the presumption in every stage of a cause being that it is without the jurisdiction of a court of the United States, unless the contrary appears from the record, Grace v. American Central Insurance Co., 109 U. S. 278, 283 [3 Sup. Ct. 207, 27 L. Ed. 932]; Bors v. Preston, 111 U. S. 252, 255 [4 Sup. Ct. 407, 28 L. Ed. 419]—we cannot shut our eyes to the fact that there exists what should be deemed an equivalent to such an agreement, namely, the right and power of those who are stockholders of each corporation to compel the one holding the legal title to convey, without a valuable consideration, such title to the other corporation."

And the court conclude:

"The arrangement by which, without any valuable consideration, the stockholders of the Virginia corporation organized a Pennsylvania corporation

and conveyed these lands to the new corporation for the express purpose—and no other purpose is stated or suggested—of creating a case for the federal court, must be regarded as a mere device to give jurisdiction to a Circuit Court of the United States and as being, in law, a fraud upon that court, as well as a wrong to the defendants. Such a device cannot receive our sanction. The court below properly declined to take cognizance of the case."

[3] The argument that it is inequitable to permit the defendant to take advantage of this objection after voluntarily going to trial upon the merits and taking his chances upon a favorable issue is without point. The most obvious answer to this is that the case is not one resting within the discretionary power of the court nor to be affected by the course or disposition of a party. But, if it were, I would be unable to hold that defendant had lost his rights by reason of the course taken. He was involuntarily haled into a foreign jurisdiction and compelled to attend here at a long distance with his witnesses. Having made his objection he refused to waive it, but, being here, took his chances on the merits of his case. There was in this nothing essentially out of keeping with the legal proprieties. The fault in the situation, if any, lies, I think, as much with the plaintiff as with the defendant, since primarily it was its duty to bring the question to the attention of the court before entering upon the merits.

But, however that may be, the question confronts us and cannot be ignored, and reaching the conclusion, as I have, from the foregoing considerations, that the case is one where the parties "have been collusively made" to confer jurisdiction upon this court, and that the case does not of right belong here, all the court can do is to dismiss it, and an order will be entered to that effect.