NILES-BEMENT-POND CO. v. IRON MOLDERS' UNION, LOCAL NO. 68, et al.

(District Court, S. D. Ohio, W. D.    October 9, 1917.)

No. 138.

1. PRINCIPAL AND AGENT ⬡⟹3(1)—AGENTS—WHO ARE—"SALES AGENT."

Complainant, a New Jersey corporation, which owned a controlling interest in the stock of an Ohio corporation, entered into a working agreement which characterized complainant as the Ohio corporation's general sales agent. By this agreement complainant was to receive a so-called commission of 10 per cent. on the contract price of goods purchased of complainant by any customer or customers and manufactured by the Ohio company, out of which sums complainant was to pay all expenses incurred in advertising and effecting sales. A portion of the orders taken in Ohio were placed directly with the Ohio company, and the residue of its output was produced for complainant, which entered into contracts for the delivery of manufactured articles. *Held* that, as a "sales agent" is one who sells goods which another person has delivered to him for that purpose and receives a compensation for his services by commission or otherwise, and as the goods manufactured by the Ohio company were not delivered to complainant for sale, complainant was not the agent of the Ohio company.

2. COURTS ⬡⟹316—FEDERAL COURTS—JURISDICTION—DIVERSITY OF CITIZENSHIP.

In such case where members of a union working for the Ohio corporation struck at a time when it was under obligation to complainant to fill a large number of contracts for machines required by the United States as war necessities, complainant, contending that the union and its members, by intimidation of other employés of the Ohio company, etc., prevented completion of the machines, filed in the federal District Court for Ohio a bill against the Ohio corporation and the Union and others to enjoin interference with the work. *Held* that, even though both corporations were interested in the performance of the contracts, nevertheless the Ohio corporation was properly joined as a defendant, and, there being diversity of citizenship, the suit could not be dismissed under Judicial Code (Act March 3, 1911, c. 231) § 37, 36 Stat. 1098 (Comp. St. 1916, § 1019), on the ground that complainant and the Ohio corporation attempted collusively to make complainant a party for the purpose of creating a case cognizable in the federal courts, and for the further reason that a collusive arrangement is not shown.

3. MASTER AND SERVANT ⬡⟹338—STRIKES—RIGHT OF LABOR UNIONS.

While laborers and members of a labor union have a legal right to strike, an employer has also a legal right to run an open shop, employing without discrimination both union and nonunion men, and a labor union has no right to prevent by coercion nonunion men from working.

4. MASTER AND SERVANT ⬡⟹338—STRIKES—RIGHTS OF UNION.

If an employer, whose union employés struck, engages others through misrepresentations, that affords no grievance to the strikers, and does not warrant them or their sympathizers to forcibly prevent a person employed through misrepresentations from working.

5. SHERIFFS AND CONSTABLES ⬡⟹86—DUTY OF SHERIFF—RELATIVE DUTY OF MAYOR.

Gen. Code Ohio, §§ 4250, 4548, make the mayor the conservator of the peace of municipalities. Section 4549 confers on him all powers possessed by sheriffs to suppress disorders. Section 4373 authorizes the mayor, in case of riots, to appoint additional policemen and officers for temporary service; and section 4378 declares that the police force shall preserve the peace, protect persons and property. Section 2833 declares that

---

each sheriff shall preserve the public peace. Section 12811 declares that, whenever three or more persons are unlawfully or riotously assembled, all judges, justices of the peace, sheriffs, and other ministerial officers shall make a proclamation in the hearing of such persons, commanding them to disburse, and, if they refuse, such officers shall call on all persons near, and, if necessary, throughout the county, to aid in taking into custody persons so assembled. *Held,* that both the sheriff of the county and the mayor of a municipality are bound to maintain the peace in the municipality, and prevent riots and unlawful assemblies, and the sheriff cannot evade his responsibility on the ground that he did not take steps to prevent rioting because of the duty of the mayor.

6. MASTER AND SERVANT ☜338—PICKETING—AUTHORITY.

While lawful picketing is permissible, large numbers should be avoided, and pickets, though they may invite workmen from a plant, factory, etc., against which the strike has been declared, to stop and discuss the strike situation, are not entitled to intimidate such workmen, or by force prevent them from working.

7. MUNICIPAL CORPORATIONS ☜703(1)—HIGHWAYS—USE.

The streets and highways are for the use of all law-abiding people, and members of labor unions and strikers have no authority to intimidate or prevent persons from using them.

8. EQUITY ☜65(2)—MAXIMS—SCOPE.

The equitable maxim that he who comes into equity must do so with clean hands does not apply to every unconscientious act or inequitable conduct on the part of the offending party, but is limited to misconduct in connection with the matter in litigation; hence, though complainant be treated as the real party in interest and bound by the acts of its subsidiary corporation, the fact that the subsidiary corporation might have broken an agreement with striking workmen under which they returned to work does not preclude complainant from securing a temporary injunction restraining the strikers from violating the law and by illegal and unlawful methods preventing others from working.

9. MONOPOLIES ☜20—TRUSTS—CLAYTON ACT.

That a New Jersey corporation owned a controlling interest in the stock of an Ohio corporation engaged in the manufacture of tools, etc., and sold the product of the Ohio company, which was in fact its subsidiary, does not bring the New Jersey corporation within Clayton Act Oct. 15, 1914, c. 323, § 7, 38 Stat. 731 (Comp. St. 1916, § 8835g), declaring that no person engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other capital of another corporation engaged in commerce, where the effect of such acquisition may be to substantially lessen competition; the ownership of the stock of the Ohio corporation not lessening or in any way affecting competition between the two companies.

10. INJUNCTION ☜101(3)—STRIKES—LABOR UNION.

Complainant owned a controlling interest in the stock of an Ohio corporation, whose product it largely disposed of, and which corporation was under contract to manufacture for complainant machines that complainant had agreed to deliver to the United States government, and which were necessary in prosecution of war work. Union employés of the Ohio corporation struck, and by threats, actual intimidation, and violence, in which members of the union, their officers, and sympathizers participated, prevented other employés of the Ohio corporation from working, thus interfering with complainant's rights. The peace officers of the municipality and county failed to discharge their sworn duties, and by acquiescence at least assisted the striking lawbreakers, and in one case arrested guards employed by the Ohio corporation, instead of their assailants. *Held* that, as the union did not take any steps to enforce law and order and had no legal right to coerce other employés, thus preventing them from working, the preliminary injunction should be granted, restraining the union and its members from continuing such violence.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Niles-Bement-Pond Company, a corporation, against the Iron Molders' Union, Local No. 68, and others. On application for temporary injunction. Injunction granted.

Allen Andrews and W. C. Shepherd, both of Hamilton, Ohio, and Murray Seasongood, of Cincinnati, Ohio, for plaintiff.

William B. Rubin, of Milwaukee, Wis., and R. J. Shank, of Hamilton, Ohio, for defendants.

SATER, District Judge. The members of the Iron Molders' Union, Local No. 68, numbering about 115, and working for the Niles Tool Company, an Ohio corporation, at Hamilton, Ohio, struck on May 24th. Aside from other orders taken by the Tool Company, it was then under obligation to the plaintiff to fill a number of large contracts for heavy and urgently needed machines, which plaintiff had agreed to deliver at an early date to the United States, and which are required by the United States as war necessities for use in machine shops, ship and naval yards, and naval gun factories. The contracts of that character aggregate about $3,000,000, and, under section 120 of the National Defense Act of June 3, 1916 (39 Stat. 213, c. 134 [Comp. St. 1916, §§ 3115f, 3115g, 3115h]), are given priority over other contracts. It is impracticable for the plaintiff to have man-ufactured elsewhere the articles which it has sold to the government.

The plaintiff's principal place of business is in New Jersey, under whose laws it is duly organized and incorporated. It owns all of the common stock of the Tool Company and enough of its preferred stock to give it a controlling interest. A large amount of the Tool Company's preferred stock is, however, held by various individuals throughout the country. The president and one of the vice presidents of the plaintiff are respectively the president and vice president of the Tool Company. The secretaries of the two companies are different. The plaintiff has nine directors; the Tool Company five, of whom three are directors of the plaintiff company. On February 6, 1900, the plaintiff and the Tool Company entered into a working agreement in which the plaintiff is characterized (improperly, I think) as the Tool Company's general sales agent, and by which it is to receive a so-called commission of 10 per cent. on the contract price of goods purchased of the plaintiff by any customer or customers and manufactured by the Tool Company, out of which per cent. the plaintiff is to pay all expenses incurred in advertising and effecting sales. About 5 per cent. of the orders taken in Ohio are placed directly with the Tool Company; the residue of its output is produced for the plaintiff. The plaintiff enters into contracts for the delivery of manufactured articles. Whatever profit the Tool Company makes on contracts sublet to it by plaintiff is, after the allowance of 10 per cent. from plaintiff's contract price, the property of such company. The plaintiff's president usually fixes the price specified in all contracts made by it, although some of the smaller ones are wrought out in plaintiff's office without coming to his attention. In fixing such price, the plaintiff necessarily fixes, also, the price the Tool Company will receive for any work which it may do for plaintiff. Both companies are inter-

ested in the adjustment of the strike. The plaintiff demanded of the Tool Company, which has taken no action regarding this suit, the fulfillment of the contracts which plaintiff has placed with it.

[1, 2] The defendants claim that in fact the real and substantial plaintiff and party in interest is the Tool Company and not the plaintiff; that the suit is brought by plaintiff against the Tool Company and its codefendants, all of whom are citizens of Ohio, for the purpose of conferring an apparent jurisdiction on the United States court; that the Tool Company has an interest in the subject-matter of the bill which will properly align it with plaintiff, in consequence of which there appears a controversy on each side of which are citizens of Ohio (Helm v. Zarecor, 222 U. S. 32, 32 Sup. Ct. 10, 56 L. Ed. 77, and cases therein cited); that, within the meaning of section 37 of the Judicial Code, the plaintiff and the Tool Company have attempted improperly and collusively to make a party plaintiff simply for the purpose of creating a case cognizable by a federal court, when in reality the only parties in interest are citizens of Ohio; and that therefore the case must be dismissed for want of jurisdiction. To sustain this contention reliance is had on Southern Investment Realty Co. v. Walker, 211 U. S. 603, 29 Sup. Ct. 211, 53 L. Ed. 346, Miller & Lux v. East Side Canal & Irrigation Co., 211 U. S. 293, 29 Sup. Ct. 111, 53 L. Ed. 189, Lehigh Min. & Mfg. Co. v. Kelly, 160 U. S. 327, 16 Sup. Ct. 307, 40 L. Ed. 444, and Phœnix-Buttes Gold Min. Co. v. Winstead (D. C.) 226 Fed. 855. The instant case, however, in its facts, is unlike any of those above mentioned.

The contract between the plaintiff and the Tool Company characterizes the former as the latter's general sales agent. Whatever may have been the status of the two companies at the time the contract was made, agency cannot now be imputed to the plaintiff. A sales agent is:

"One who sells goods which another person has delivered to him for that purpose and receives compensation for his services by a commission or otherwise." Ommen v. Talcott, 188 Fed. 401, 403, 112 C. C. A. 239, 241 (C. C. A. 2).

The goods manufactured by the Tool Company are not delivered to the plaintiff for sale. On the contrary, the plaintiff sells goods to be manufactured and delivered. It then permits the Tool Company, by virtue of its contract with it, to produce for it the goods so to be delivered. The Tool Company is in the nature of, if not in fact, a subsidiary company of the plaintiff. It owns none of the plaintiff's stock, and cannot control it; but the plaintiff, as the owner of a majority of the stock of the Tool Company, has the mastery and control of that corporation, and may dictate its policy. United States v. Northern Securities Co. (C. C.) 120 Fed. 721, 725, 726; Id., 193 U. S. 197, 326, 24 Sup. Ct. 436, 48 L. Ed. 679. Should the plaintiff permit the Tool Company to manufacture the articles which plaintiff has agreed to deliver, it receives, not only its established percentage on the contract price, but, as the owner of a majority of the stock of the Tool Company, the greater part also of the profit made by the latter company, if it manufactures the articles at a profit. The Tool Company, however, cannot compel the plaintiff to permit it to manufacture any article which plaintiff has sold and obligated itself to deliver.

In Carroll v. C. & O. Coal Agency Co., 124 Fed. 305, 61 C. C. A. 49 (C. C. A. 4), on which this case is bottomed, there was no interlocking of directors, nor did the plaintiff own any of the stock of any of the defendant companies. In that case the plaintiff was engaged in the business of selling coal and coke. It had contracts with the defendant coal companies by which it was to take and pay for all their product at the mines, to furnish transportation, and to sell the same at prices fixed by the companies, receiving a stipulated sum per ton for its services. By the terms of such contracts the defendant companies were not liable for damages for failing to furnish coal or coke to the plaintiff, where such failure was caused by strikes. In reliance on such contracts, the plaintiff made contracts for the sale of large quantities of coal and coke, which could only be supplied from the mines of the defendant companies. The latter were prevented from furnishing the same by the wrongful and illegal acts of individual defendants, who were conducting a strike among the miners, and who by intimidation and threats prevented others from working in the mines. It was held that on such a state of facts the plaintiff had such an interest as entitled it to maintain the suit in its own right for its protection, independently of the coal companies, which, although properly made defendants, could not be aligned with the plaintiff to defeat the jurisdiction of the federal court; their interests, although perhaps not adverse, being based on different rights. The reasoning of that case is so peculiarly applicable to the case at bar, and withal is so sound that it is here adopted, in so far as pertinent, without repetition. Jurisdiction is not wanting.

At the conclusion of the evidence the announcement was made that the facts warranted the granting of an injunction, and that counsel need argue only two questions—that above mentioned relating to jurisdiction, and the further question as to what defendants should be enjoined. The evidence coming from the witnesses for the defense, most of whom were reluctant and unwilling, and some of whom as to important matters were incredible, discloses a situation requiring regulation, and, reinforced by the evidence submitted by the plaintiff, makes clear the duty of the court to stay further lawlessness. If the granting of relief depended on the occurrences of July 8th and 9th alone, the delay in bringing the suit would require a denial of relief; but the incidents that then transpired so reflect on the attitude of the strikers and their active sympathizers, and their conduct on those occasions is so akin to that which was exhibited on September 10th and 11th, immediately preceding the filing of the bill, that those incidents, as well as others appearing in the record, enter into and form a part of the history of the strike.

[3] The light thrown by the record upon the situation as it existed between May 24th and July 8th shows, in view of the subsequent events, an abnormal condition in the city of Hamilton, which demanded the careful watchfulness and regulation of the officials, municipal and county, charged with the maintenance of order and the public peace, and the exercise of a wholesome restraining influence on the part of the union, strikers, and employers, if a repression of lawlessness were ultimately to be assured. Labor has a right to strike. The strike is sometimes

the only weapon laborers may wield to obtain their just deserts. The molders were at liberty to contend for the employment of union labor only at the Tool Company's plant, this being one of the principal points in controversy; but the company has the right to run an open shop, employing without discrimination both union and nonunion labor, when and as such labor offers itself to meet the company's needs. The union men were not required to work for the company, but they had no right to say that no one should take the places which they had left, or that those places should not be filled by nonunion men. The right to form and to join a union exists. The right to prevent another man from working, if he does not belong to a union, does not exist. This is still a free country. Every man may use his labor, his acquired or God-given talents, of whatever worthy kind, in an honest way to earn a livelihood and gain a competency. In the eyes of the law the rights of a union man are no higher and no more sacred than those of the non-union man. The rule of equality prevails. A person may join a union or not, as he pleases, and no one has a right to deny him the privilege of working, or to harass, annoy, abuse, or maltreat him because he works, or is willing to work, in the place made vacant by a striker. Whenever either labor or capital resorts to discrimination, oppressive conduct, or words or deeds of violence, it discredits and weakens itself, and invites the accompanying defeat which usually follows.

The Tool Company, some time prior to July 8th, busied itself to find molders to take the places of those that had struck. On account of contracts which it had taken to produce war necessities, it had for the protection of its plant taken on 20 guards or watchmen in April. Their number, after the strike occurred, was increased until it now reaches 60. They are all paid by the company. It had, for the purpose of housing its future employés, purchased the Atlas Hotel and placed McGaughey in charge of it. If that action was rendered necessary by strike conditions, if it had ceased to be secure for a laboring man to occupy his own house, or a boarding house of his own choosing, lawful bounds had already been passed. On July 8th some 13 men reached Hamilton to work in the foundry, 5 of whom arrived in the evening. Guards had gone to the depot with a truck to meet them and take them to the hotel. There were also at the depot a quite large crowd of strikers and their sympathizers. The guards succeeded in getting the men in the truck. One of them was pulled from it, beaten, badly bruised, and sent to the hospital to be cared for. West participated in that assault. He enters a denial, as he does, also, of his wanton and cruel attack on Wise and Reichel on September 10th, but the evidence of his guilt is convincing. Deininger, who says he was captain of the pickets, Hufnagle, and Archer (Apscher) were also in the crowd. Deininger was seen with 4 of the men corralled against a wall, telling them that they better get on a train and get out of town. Five of the men that arrived that day were taken to the Tool Company's plant, kept there over night, taken out of a rear door the following morning and to an interurban station, from which they departed for Cincinnati. The others, except the one that was assaulted, were taken on their arrival to the hotel. McGaughey, who had gone to the depot to meet a cook, on account of the large and threatening crowd which had assembled at the

hotel, was compelled to register him at another place, and was not able to return to the hotel until 1 a. m. The crowd which had been about the hotel all day swelled, until in the evening it reached, according to Stricker, the chief of police, large proportions.

Stricker's statements do not entirely consist. He says that he first heard of the trouble at the Atlas hotel about 6 p. m., that on going there he found 25 or 30 on the outside, that there were a number of men there intending to work for the Tool Company, and that, after remaining there about half an hour, he left, and subsequently learned, about 7:30, that there was trouble at the hotel. On his return there he found quite a number of people, and on entering he learned that there were inside 9 men and the guards, Graf and Thomas. Later he said that he first heard of a disturbance at the hotel as early as 3 p. m., when he was in the country, and was told it looked like there was going to be trouble there; that when he got there he found a "mob"; that it looked like more than 1,000 or 1,500 people, like it was their intention to get the men out of the hotel; that it looked "dangerous to everybody, * * * inside and outside, the property and everything." Further detailing what occurred in the evening, he testified that he learned from the nine workmen that they wanted protection and to get out of town. Inquiring under what pretenses they were brought there (which was manifestly no affair of his), he was told, he says, that things had been misrepresented to them, that they had been offered given wages on govrnment work where there was no trouble, and that they wished to know if he would protect them and get them out of town. He states that he told the crowd what the men wished, asked 2 or 3 of the molders who approached him if they would play fair, and told the molders that if there was going to be any trouble the men would be protected. He asked the molders and their committee to help him out. He says there were 2,000 or 3,000 people there, and that he was doing the best he could to save life and property. The 9 men, as they went to the depot, were marched through the crowd, holding their hands above their heads, each marching by the side of a molder, and all followed by policemen. Ugly language and threats were used that evening, especially toward the guards, Graf and Thomas. On the following day the chief found a couple of colored men at the depot. Strikers, who thought those men were going to work for the Tool Company, had taken them to that place to force them out of town, when in fact they were on their way to another point to perform construction work in the country.

[4] The strikers and those co-operating with them were picketing or watching the depots to intercept any incoming laborers for the Tool Company. They had a right respectfully to inquire of any discharged passenger as to whether he intended to work for the Tool Company or not, and, if he chose to converse with them, to endeavor peacefully to persuade him; but they had no right to interfere with his movement, or to compel him to stop against his will, or to force a conversation on or an argument with him, or to intimidate or assault him, or to tell him he would better leave town, or to compel or try to compel him to do so. If, as the defense claims, some of the men had been brought there under misrepresentations made by the company, that might give ground for complaint on the part of the deceived

persons against the company; but it afforded no cause of grievance to the strikers, and no justification for any uncivil or unlawful conduct on the part of them or their friends. The unwarranted interference with the unoffending negroes indicates the extent to which the disregard of the rights of others had gone. Although the police department knew by the middle of the afternoon that trouble was threatened at the Atlas Hotel, the record is barren of evidence of any attempt to prevent the assembling of the crowd, or to disperse or control it. It was allowed to grow until it became what the chief of police terms "a mob." Twelve policemen were present in the evening. What a squad of courageous policemen or deputy sheriffs, bent on the performance of their duty, could have done to preserve the peace, we do not know, because no effort in that behalf was made. On the contrary, the chief of police called on members of what he characterized as "a mob" to aid him in conducting in safety to the depot men who had committed no offense and whose legal right to be unmolested on the streets could not be questioned. The rare spectacle was witnessed of unoffending men, deprived of the protection guaranteed by law, being marched to the depot with uplifted hands, to be sent out of town, while the offending crowd that provoked such a situation was suffered to remain undisturbed.

[5] By the express provisions of sections 4250 and 4548, Ohio General Code, the mayor is made the conservator of the peace. Section 4549 confers on him all the powers possessed by sheriffs to suppress disorder and keep the peace. By the terms of section 4373, he may, in case of riots and other like emergency, appoint additional patrolmen and officers for temporary service. Section 4378 declares that the police force shall preserve the peace, protect persons and property, and obey and enforce all ordinances of council and all criminal laws of the state and the United States. Section 2833 provides that:

"Each sheriff shall preserve the public peace and cause all persons guilty of a breach thereof, within his knowledge or view, to enter into recognizance' with sureties to keep the peace and to appear at the succeeding term of the common pleas court of the proper county, and commit them to jail in case of refusal."

The mandatory injunction of section 12811 is that:

"Whenever three or more persons are unlawfully or riotously assembled, all judges, justices of the peace, sheriffs, and other ministerial officers, forthwith upon view or as soon as may be on information, shall make proclamation in the hearing of such persons, commanding them, in the name of the state of Ohio, to disperse and depart to their several homes or lawful employment, and, if such persons do not then forthwith disperse and depart, such officers shall call upon all persons near, and, if necessary, throughout the county, to aid and assist in dispersing and taking into custody all persons so assembled. Each of such persons, so called, refusing to render immediate assistance, shall be fined not more than fifty dollars."

On the night in question, the officers of the Tool Company called on the sheriff (who testified in this case) to protect its property, and were told that the mayor was the one to look after that, and that, if he needed assistance, he (the sheriff) would come down. Following the disturbance of September 10th, hereafter to be considered, he was in-

formed that there had been a riot on that date. It is incredible that he and the mayor did not know of the conditions existing in Hamilton. Indeed, there is no claim of ignorance in that respect. In so far as the record shows, he neither took action nor made inquiry, with a view of apprehending offenders, touching the happenings on either of the occasions mentioned. If he did either, it must be assumed that he would have mentioned it in his evidence. Nor does it appear that any one was arrested by him or the police department, whose duties were inefficiently performed, on account of the events which transpired on July 8th or on September 10th, except as hereafter noted. The sheriff's refusal to act on July 8th, and his attempt to cast the entire responsibility for action on the mayor was a shirking of his duty to observe the mandatory provisions of sections 2833 and 12811, which he was sworn to enforce. Whether the gatherings on the streets on July 8th and September 10th were mobs or not, they were manifestly unlawful assemblages. As regards responsibility in such cases, the sheriff and the mayor stand, by express statutory provision, on an equality. Neither is permitted to cast the burden of action on the other. It is as much the duty of the sheriff as of the mayor or "other ministerial officer, *forthwith upon view or as soon as may be on information*," to command a mob or unlawful assemblage to disperse and depart to their several homes or lawful employment. The appointment of special deputy sheriffs or additional patrolmen was not required, because the officer making proclamation is authorized to call upon persons near to assist in dispersing the crowd, and, if such persons refuse, they may be punished for such refusal. The law imposes on the sheriff and all those exercising authority over and in the police department the active duty to maintain the public peace. Had there been watchfulness to prevent disorder, had disturbers of the peace been made to feel the strong arm of the law when trouble was threatened and in its incipiency, order could have been maintained and acts of violence and lawlessness averted. In New York, Lake Erie & Western R. R. Co. v. Wenger, 17 Wkly. Law Bul. (Ohio) 306, 308, it is said:

"The old notion of not interfering with persons until they shall have actually committed a wrong, is fundamentally erroneous. The remedy which prevents a threatened wrong is, in its essential nature, better than a remedy which permits the wrong and then seeks compensation for it by the pecuniary damages which a jury may assess. * * * The ideal remedy in any perfect system of administering justice would be that which absolutely precludes the commission of a wrong, not that which awards punishment or satisfaction for a wrong after it is committed."

A mob or an unlawful assemblage is a cowardly thing. If in its formative period, or even in its somewhat advanced stage, it be fearlessly taken in hand by courageous ministerial officers, who have regard for their own efficiency and respect for the sanctity of their oaths of office, it almost always quickly melts away. Sheriffs and mayors and their subordinates are selected for and accept their positions to direct and do promptly just that kind of work, when occasion requires. There may be here and there a lawless obstreperous person who will resist officers who thus perform their sworn duty; but those officers are authorized to meet resistance with force, and with as much force

as is necessary to subdue him and conserve the peace. Where the officers of the law are derelict of duty, as they were touching the matters here under consideration, many ordinarily well-disposed, but sympathetic, persons may follow vicious and evil-disposed leaders into subverting the law, endangering not merely the property, but the liberty, limbs, and life, of others, and rendering the preservation of order difficult and dangerous. There are rare occasions when the angry passions of a community are so aroused by some heinous crime that a quickly gathered assemblage will add another to that already committed before the peace officers can assemble or prevent. We have no such situation before us. The conditions in Hamilton were well known, and demanded vigilance and prompt action on the part of the guardians of the law, to avoid disturbances. Had they met the situation fearlessly and at the threshold, wrongdoing could have been prevented, and this case would not be here. It is always a grave reflection on peace officers, when, on account of their dereliction of duty, citizens of their community are forced to appeal to the courts to maintain the supremacy of the law and to give the protection such officers are bound by oath to afford. The ministerial arm can act more quickly and is no less powerful than that of the courts, and should be prudently, impartially, and, if need be, vigorously employed. If the Ohio statutes do not sufficiently provide for the speedy and sure removal of such derelicts from office, amendments ought quickly to be made, that such may be done.

[6, 7] The Tool Company's plant was picketed, some of the picketing being done by others than the strikers. Lawful picketing is permissible, but the number of pickets should not be large. There is power in numbers, and, when the number is large and unfriendly, it intimidates and terrorizes. Every man, be he friend or foe, has the right to work and to come and go to his work without fear or molestation. He may be invited to discuss the strike situation, and, if he chooses, may stop and listen. The right to peacefully persuade him, but not by violence, threats, or intimidation, exists. If he does not wish to stop or hear, he may not be compelled to do so. No one or more may lawfully follow him, as was in specific instances done, and while following him, or while he is passing, annoy, or abuse, or threaten, or intimidate him, or apply to him offensive language or names, or opprobrious epithets. The streets and highways are for the use of all law-abiding people. To such they should be as free as the air, that whosoever will, having due regard to the rights of others, may travel them in the pursuit of his legitimate business, without hindrance or annoyance. The record shows it was necessary to escort workmen for their protection with guards, and that even then some of them were assaulted and beaten up, and that others, desiring to leave the city, were thus escorted or taken in automobiles to points beyond the corporate limits.

The existence of such a condition shows that there was something radically wrong with the conduct of the strike, with the committee charged with its management, and the enforcement of the law. There was no justification for Miller going to the home of Garver (towards

whom he entertained a feeling of enmity), not for the purpose of reasoning with him, but for the purpose of abusing and threatening him, if he should serve the Tool Company, and of daring him out of his home to fight. I am convinced there were threats to destroy the company's plant, and that they did not all emanate from the members of Local No. 68. There were some names applied in the strike that, owing to their character and human weakness, are usually met by a blow. If those names were used at times by the guards, as the defense claims, that was no justification for their use by the strikers or their friends, or vice versa. The record shows that men have been warned against working for the Tool Company, and threatened, if they should do so, and that men willing and anxious to work have been deterred from so doing through fear of violence. The long years of service rendered by some of them for a single employer suggests that they must be good workmen and good citizens. They have the same right to make a living as the men who strike. The law will not permit the latter to compel the former to remain idle.

In the vicinity of the Tool Company's works are a number of manufacturing plants employing large numbers of workmen, many of whom were in sympathy and co-operated with the members of Local No. 68. On the afternoon of September 10th, following the resumption of work at the Tool Company's plant, a large crowd assembled at or near it, about the time the employés had completed their work. Schalk's evidence minimizes the size of the crowd; but Furrey, who attached his name to a circular as secretary of the striker's committee, says the crowd numbered from 1,000 to 1,500. It was hostile to the handful of molders that left the plant, and its numbers were such as would incite fear. Guards proceeded to escort some, at least, of the workmen to their homes. Some of the guards and Wise and Reichel were intercepted. Reichel's version of what transpired is uncontradicted, except by Schalk and West, and by them as to no matter of consequence, except as to their part in the assaults, and is as follows:

"A fellow grabbed my arm and said, 'I want to talk to you.' I told him, 'I don't want to talk to you; I have got no business with you.' And so they pulled me—there was about a dozen of them around pulling and pushing, one by the side of the other, and I tried to get back to Bruning's fence in order to jump over there, and just when I turned around, why, I was struck. * * * Why, he says, 'If we can't talk to you, we will learn you a lesson,' and some fellow in the crowd hollowed, 'Go to it, Bum,' and just then I was struck on the back of the head."

"Bum" is the nickname of West. When asked what happened when he was thus struck, he answered:

"Why, I stopped, and I tried to get to the fence, and then I was hit again, * * * and it knocked me on my knees. I got up, and Mr. Graf grabbed the man, and the man there didn't know who he was, and he told the policeman to take him in the wagon and take him down to headquarters."

When Welch, the police chauffeur, saw Reichel, he was bleeding from a scalp wound in the back of his head. Lake saw West hit him with his fist, and Schalk hit him on the head with a brick, or a portion of one. Wise, who was likewise assaulted, thus describes the attack on himself:

"After I seen that man nodding his head (which Wise took to be a signal for something), I turned around and I saw William West running, and I backed up against the fence, and he stopped right in front of me, and the rest of the men started to going on; but he asked me, 'What do you mean by scabbing?' * * * 'Why don't you take out a card?' and I says, 'I don't believe in any union.' He says, 'If you go up there to-morrow, I am going to get you;' and just at that there was something stirring on my left, and I didn't turn around, and he said, 'Get in that gate.' * * * I was standing right by Bruning's gate, and I reached around to get the handle open, and just as I reached around he struck me, and then Bruning opened the gate and pulled me in, and that is all."

It was West that struck him. A disinterested and credible witness, who saw the attack on Wise and who identified West in the courtroom, in speaking of West, said:

"He looked at Mr. Wise very threateningly, and with his finger extended said, 'If you dare return to work to-morrow morning I will knock hell out of you; understand?' * * * Then about that time there was a skirmish a few houses south of where we live. They apparently were assaulting a man up there. I could tell by the crowd, the way it was moving, that something was going on; * * * and with that some one down there yelled. 'Hit him! hit him!' and with that Mr. West drew back his right arm and aimed at Mr. Wise's face, and I saw him draw back his arm, and I heard the sound of the blow. * * * A policeman stepped forward and asked me if that was the man that struck Mr. Wise. Of course, I didn't know Mr. Wise's name at the time; and I also saw the other man who had been struck. The blood was flowing down the back of his head."

Leopold, an employé of the company for about 27 years, was told, soon after the strike began, because he would not join the union, that, if the strikers won, he would not work for the company any more—was threatened and against his expressed wish followed home by Luegers, who made threats against Reichel and about tying up Mr. Wood and Lew Baden of the Tool Company. To insure Leopold's safe arrival home on September 10th required, on account of the strikers along the street lying for workers, an escort consisting of the mayor, two guards, and four policemen; he was, on September 11th, twice warned by a picket not to return to work, was at the courthouse assaulted by Walter Price and two or three others, was struck twice, knocked down, and kicked in the temple into insensibility (as I understand his evidence) after he had fallen. He still bore visible proofs of his injuries when he was on the witness stand. There is not a scintilla of evidence that Reichel, Wise, and Leopold, or any one of them, at any time by word or deed behaved himself unseemly, or provoked an assault, or committed an offense, unless it be an offense for a man to use his brain and brawn to earn an honest living. The part which West and Schalk took in the unprovoked and cruel assaults on the unresisting Wise and Reichel is firmly established.

In mitigation it is urged that two of the guards drew their guns and that Graf was striking with a black-jack. No apology will be made for such conduct; but, whatever may have been the wrongful conduct of the guards, the situation thrust upon them by the strikers and their friends was such as was calculated to incite a resort to weapons of defense. The evidence is conflicting as to whether they held their guns by their side or pointed them at the crowd, and whether, if they

did the latter, as to the time of their so doing. The evidence of Reichel and Welch indicates that the appearance of the guns and of the black-jack followed, and did not precede, the assaults on Reichel and Wise. The attention of the police was specifically directed to the fact that West was guilty of an assault, yet he was permitted to walk to the police station with Schalk, who had with West participated in one of those assaults, and Schalk went on West's bond. The guards, however, were taken by the police in an automobile to the police station, and there released, on the ground that they had been authorized to carry guns. If the guards exceeded legal limits, the question then arises, Why were they, as offenders of the law, taken in charge by the police in an automobile, and another known offender intrusted to the keeping of his co-offender and permitted to report as if not under arrest? The only answer found in the record is that Schalk so requested, and that request was sufficiently persuasive to induce the discrimination mentioned.

A belief that labor cannot win a strike without resort to unlawful means does it injustice. A statement that such means are necessary to succeed is a slander. It is the reckless and lawless few (and their like is found in all avocations) that foment trouble, which leads to wrongdoing and often ultimately throws the weight of public opinion against the striker. Labor is entitled to its just deserts, and may lawfully strike to get them; but neither labor nor any other aggregation of beings should permit its cause to be injured by the misbehavior of mischief makers, whether they be merely sympathizers or found within its own ranks. It should stand for the reign of law.

[8] Some sort of a truce having been patched up, the strikers, on or about July 23d, returned to work. About four days later they again quit. The defense claims, as I understand its position, that this was due to a breach of faith on the part of the Tool Company when the arrangement of the final terms of settlement was undertaken, and the claim is therefore made that the plaintiff cannot obtain equitable relief, because it does not come into court with clean hands. I did not deem it advisable to enter into an investigation of that matter, for the reason that, if the claim of bad faith is well founded, there was but a breach of contract, and that, assuming even the plaintiff to be the same as the Tool Company, such breach did not justify acts of lawlessness. If the defendant company is guilty, as charged, and if its codefendants seek relief on that account, the subject-matter of that action would be different from that here involved. The maxim invoked does not apply to every unconscientious act or inequitable conduct on the part of the offending party. It is limited to misconduct connected with the matter in litigation, and does not apply to misconduct which is unconnected therewith. Bentley v. Tibbals, 223 Fed. 247, 252, 138 C. C. A. 489 (C. C. A. 2). In Kinner v. Lake Shore & Michigan Southern Ry. Co., 69 Ohio St. 339, 69 N. E. 614, the rule is stated that the maxim, "He who comes into equity must come with clean hands," requires only that the plaintiff must not be guilty of reprehensible conduct with respect to the subject-matter of his suit.

[9] Nor does the ownership by the plaintiff of a majority of the defendant company's stock substantially or otherwise lessen competi-

tion between them (if they can at all be said to compete), or restrain commerce, or create a monopoly in any line thereof. As heretofore stated, the Tool Company is in effect, if not in fact, a subsidiary corporation, engaged largely, if not wholly, in performing contracts sublet to it by the plaintiff. The case is not within the provisions of section 7 of the Clayton Act (38 Stat. at Large, 730). If unfavorable or oppressive conditions exist at the Tool Company, or if that company has endeavored to enforce such conditions upon the workmen, they were not required to remain in its employ. If such conditions exist, this court has not the power to correct them; nor should it deny the plaintiff relief, if its property rights are invaded. The terms on which the molders shall work are a matter of contract between them and the company. It is significant that, whatever the terms and conditions may be which the Tool Company offers, there are persons who would gladly serve it, were they not deterred by fear from so doing.

[10] The rule which prevails in the granting of temporary injunctions was stated by Judge Sage in Casey v. Cincinnati Typographical Union No. 3 (C. C.) 45 Fed. 135, 147, and by our Circuit Court of Appeals in Blount v. Société Anonyme, etc., 53 Fed. 98, 101, 102, 3 C. C. A. 455, and City of Grand Rapids v. Warren Bros. Co., 196 Fed. 892, 116 C. C. A. 454. Measured by that rule, relief must be granted as prayed for against all of the defendants. Its effect will be to restrain them from doing what any good citizen will not wish to do. The evidence of the active participation of many members of Local No. 68 is abundant. There is also evidence that members of that union were instructed to keep within legal bounds, but neither its officers nor its strike committee enforced the instructions. Indeed, Schalk, a member of that committee, participated in violent conduct. Some of the members of Local No. 283 also actively shared in the matters of which complaint is made. There is no showing that any officer or member of that body by word or deed discouraged the wrongful conduct herein mentioned. The efforts of the plaintiff to bring about a full disclosure of the unhappy occurrences connected with the strike received no assistance from that union, which defended at the hearing. If it deprecated the disorder that prevailed, or disapproved of wrongdoing on the part of its members, as it ought to have done, it should have cleared its skirts when the opportunity offered.

Let the temporary injunction go.